**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NEWCAL INDUSTRIES, INC., a
California Corporation; CPO. LTD.,
a California Corporation; PINNACLE
DOCUMENT SYSTEMS, INC., a
California Corporation; KEARNS
BUSINESS SOLUTION, INC., a South
Carolina Corporation,
                    *Plaintiffs-Appellants,*

            v.

IKON OFFICE SOLUTION; GENERAL
ELECTRIC CORPORATION, a Delaware
Corporation,
                    *Defendants-Appellees.*

No. 05-16208

D.C. No.
CV-04-02776-FMS

OPINION

Appeal from the United States District Court
for the Northern District of California
Fern M. Smith, District Judge, Presiding

Argued and Submitted
April 19, 2007—San Francisco, California

Filed January 23, 2008

Before: Andrew J. Kleinfeld and Sidney R. Thomas, Circuit
Judges, and Timothy M. Burgess,* District Judge.

Opinion by Judge Thomas

---

*The Honorable Timothy M. Burgess, District Court Judge for the District of Alaska, sitting by designation.

## COUNSEL

Maxwell M. Blecher, James Robert Noblin, Matthew E. Hess, Blecher & Collins, Los Angeles, California; and James A. Hennefer, Hennefer & Wood, San Francisco, California, attorneys for the plaintiffs-appellants.

Brad D. Brian and Joseph D. Lee, Munger, Tolles & Olson LLP, Los Angeles, California; attorneys for defendant-appellee General Electric Corporation.

Alfred C. Pfeiffer, Jr., Holly A. House, Tyler B. Theis, Brian C. Rocca, Rachel Sommovilla, Bingham McCutchen LLP, San Francisco, California, Attorneys for defendant-appellee, IKON Office Solutions, Inc.

## OPINION

THOMAS, Circuit Judge:

Five lessors of copier equipment (collectively "Newcal") appeal the dismissal of their complaint for failure to state viable Sherman Act antitrust, Lanham Act, and RICO claims against Defendant IKON.[1] We reverse.

---

[1] General Electric Corporation ("GE") bought and enforced some flexed IKON contracts and is included as a Defendant for its role in the allegedly anti-competitive scheme.

I

Newcal and IKON compete to lease name-brand copier equipment to commercial customers.[2] They also compete to provide service contracts for the maintenance of that equipment during the term of the lease. When a lease approaches the end of its term, a new competition begins for the lease of upgrade equipment. Similarly, when a service contract approaches the end of its term, a new competition begins to buy out the service contract and to provide lease-end services.

Newcal alleges that IKON engaged in an ongoing scheme to defraud IKON customers by amending those customers' lease agreements and service contracts without disclosing that the amendments would lengthen the term of the original agreement. The purpose of extending the contracts was to shield IKON customers from competition in the aftermarkets for upgrade equipment and for lease-end services. That is, by extending the term of the original contract, IKON was able to raise the contract's value, which in turn raised the price to Newcal and other competitors of buying out that contract in the aftermarkets for equipment upgrades and lease-end services.

IKON, it is alleged, obtained lease extensions from its customers without disclosing that the contract amendments the customers signed would result in an extension on the term of the original lease or service agreement. In fact, IKON allegedly deliberately misled its customers to believe that the contract amendments would *not* affect the original contract's term.

Newcal, which competes with IKON both in the primary market for equipment leases and in the aftermarket for equip-

---

[2]Because this case is an appeal from a dismissal under Fed. R. Civ. P. 12(b)(6), we accept as true all facts alleged in the complaint, and we draw all reasonable inferences in favor of Plaintiffs-Appellants, Newcal.

ment upgrades, brought claims under the Sherman Act, alleging antitrust violations, under the Lanham Act, alleging false advertising, and under RICO, alleging racketeering activity predicated on mail and wire fraud. Newcal also requested a declaration under the Declaratory Judgment Act, 28 U.S.C. § 2201, that IKON's fraudulently procured contracts were invalid.

On December 24, 2004, the district court dismissed the declaratory complaint and denied Newcal's request for leave to amend that complaint. The district court held that Newcal lacked standing to request a declaration of third parties' contractual rights, and it concluded that amendments to the declaratory complaint would be futile. In the same order, the district court dismissed all other claims under Rule 12(b)(6), but it granted Newcal's request for leave to amend those claims.

Newcal filed a first amended complaint, pleading its fraud allegations with greater specificity and adding greater detail to its antitrust and Lanham Act claims. IKON again moved to dismiss under Rule 12(b)(6), and the district court granted the motion, holding that Newcal had failed to allege a legally cognizable "relevant market" under the Sherman Act, that it had failed to allege any false statement of fact under the Lanham Act, and that it had failed to meet RICO standing requirements. The district court dismissed the complaint with prejudice. This timely appeal followed.

II

A

The first question we must address is whether Newcal's antitrust claims allege any legally cognizable "relevant market." We conclude that they do, and we therefore remand those claims to the district court.

**[1]** In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a "relevant market." That is, the plaintiff must allege both that a "relevant market" exists and that the defendant has power within that market.[3]

There is no requirement that these elements of the antitrust claim be pled with specificity. *See Cost Management Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996). An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the "relevant market" is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial. *See High Technology Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (holding that the market definition depends on "a factual inquiry into the 'commercial realities' faced by consumers") (quotations omitted).

There are, however, some legal principles that govern the definition of an antitrust "relevant market," and a complaint may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is facially unsustainable. *See Queens*

---

[3]Newcal brings four of its six antitrust claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, which governs restraints of trade and tying, and it brings the remaining two claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, which governs monopolization and attempted monopolization. The "relevant market" and "market power" requirements apply identically under the two different sections of the Act, meaning that the requirements apply identically to all six of Newcal's claims. *Compare Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1444 (9th Cir. 1995) (restraint of trade), *with Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1423-24 (9th Cir. 1995) (tying), *and with Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992) (monopolization). For purposes of this opinion, therefore, there is no need to distinguish or differentiate among Newcal's various claims; its market allegations are either sufficient or insufficient for all six claims.

*City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997).

**[2]** First and foremost, the relevant market must be a *product* market.[4] The consumers do not define the boundaries of the market; the products or producers do. *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962).

**[3]** Second, the market must encompass the product at issue as well as all economic substitutes for the product. *Id.* As the Supreme Court has instructed, "The outer boundaries of a product market are determined by the reasonable interchange-ability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* As such, the relevant market must include "the group or groups of sellers or pro-ducers who have actual or potential ability to deprive each other of significant levels of business." *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).

**[4]** Third, although the general market must include all eco-nomic substitutes, it is legally permissible to premise antitrust allegations on a submarket. That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or monopolization of a small part of the general market of substitutable products. In order to establish the existence of a legally cognizable submarket, the plaintiff must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the gen-eral product market. In *Brown Shoe*, the Supreme Court listed several "practical indicia" of an economically distinct sub-market: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteris-

---

[4]Antitrust law requires allegation of both a product market and a geo-graphic market. Newcal alleges a geographic market of the United States, and IKON does not challenge that allegation. The only question on appeal is whether Newcal alleged a legally viable *product* market.

tics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325.

In its first amended complaint, Newcal listed four product markets: (1) "replacement Copier Equipment for IKON and GE customers with Flexed IKON Contracts," (2) "Copier Service for IKON and GE customers with Flexed IKON Contracts," (3) "Copier Service for Canon and Ricoh brand Copier Equipment," and (4) "Copier Equipment."

**[5]** The district court held that the last two of those markets failed to support Newcal's claims because Newcal nowhere alleged that IKON holds market power in the nationwide market for copier equipment leases or in the nationwide market for Canon and Ricoh-brand copier equipment service. We agree with that conclusion. Newcal does not allege that IKON holds power within those markets.

The district court also concluded that the first two markets were not legally cognizable, finding that the boundaries of those markets impermissibly depended on a contractually-created group of consumers. Relying primarily on the Third Circuit's opinion in *Queens City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), and secondarily on this court's opinion in *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), the district court held that such a contractually-created group cannot constitute a "relevant market" for antitrust purposes.

Newcal responds to the district court's analysis by arguing that *Queens City Pizza* and *Forsyth* are inapposite to its claims and that the more analogous case is *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), which permitted an antitrust plaintiff to restrict its alleged market to consumers of Kodak-brand products.

We agree with Newcal. Under *Eastman Kodak*, Newcal's market definition does not fail as a matter of law, at least on a Rule 12(b)(6) motion.

In *Queens City Pizza*, the Third Circuit confronted an antitrust complaint against Domino's Pizza, brought by a group of Domino's franchisees. 124 F.3d at 433-34. As part of their franchise contract, the franchisees had specifically agreed to make their pizzas with only Domino's-approved ingredients and supplies, and they had agreed to purchase those inputs only from the Domino's corporation or from a Domino's-approved supplier. Applying these contractual provisions, Domino's purchased approximately 90 percent of its franchisees' inputs from external suppliers and sold them to its franchisees at a markup. *Id.* at 433-34.

The franchisees sued Domino's for monopolization of the market for pizza ingredients. They restricted the relevant market definition to the market for Domino's-approved inputs, excluding from their market definition many substitutable brands of dough, tomato sauce, and paper cups. They further restricted the relevant market to Domino's franchisees, alleging that the franchisees constituted a cognizable submarket of the general market for Domino's-approved inputs. *Id.* at 435.

The Third Circuit held that the franchisees' market definition was legally deficient because the boundaries of the submarket depended on a contractual obligation. *Id.* at 438. The Third Circuit noted that market boundaries must be based on economic substitutability of the relevant product, and the only thing that prevented franchisees from substituting other brands for Domino's-approved pizza ingredients was an explicit contractual provision that the franchisees knowingly and voluntarily signed. *Id.* That contractual provision did not change the fundamental nature of the inputs, which remained economically substitutable with other brands of the same inputs; the provision merely changed the plaintiffs' legal freedom to choose substitutes. The Third Circuit held that the

contractually created difference among otherwise-substitutable products was insufficient to create an economically distinct antitrust submarket. *Id.*

The Third Circuit also grounded its holding in the fact that the primary market for franchise agreements is a competitive market. *Id.* at 440. The court reasoned that the franchisees should have been aware, at the time that they chose to enter a Domino's franchise rather than, say, a Pizza Hut franchise, that Domino's would retain exclusive rights to provide them with ingredients. *Id.* That reasoning was particularly relevant in that case, as the court noted, because the product itself was a "contractual framework" in which the franchisees' rights and obligations were clearly defined. *Id.* In other words, because the product was a written agreement that was intended to regulate rights and obligations for the foreseeable future and because there was a competitive market for substitutable written agreements that might have contained different rights and obligations, the franchisees must have made a conscious and voluntary choice to bind themselves to Domino's aftermarket restrictions. The implication of that reasoning was that competition in the primary market for franchise agreements sufficed to discipline anticompetitive conduct in the aftermarket for pizza supplies. If Domino's abused its contractual rights, it would lose business in the primary market; fewer people would choose to enter a Domino's franchise.

Based on this reasoning, the Third Circuit held that the alleged submarket of Domino's franchisees must fail. The only thing that segregated the members of the submarket from the members of the general market was an explicit contractual provision that the franchisees knowingly and voluntarily signed, and Domino's ability to abuse that contractual power would be restrained by competition in the primary market for franchise agreements.

The other case cited by the district court was *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). In that case, we

applied reasoning similar to the reasoning in *Queens City Pizza* to affirm summary judgment against an antitrust plaintiff. Consumers of Humana health insurance policies sued Humana, claiming that the insurance company obtained discounts from acute care hospitals without passing those discounts to consumers in the form of lower premiums. *Id.* at 1472. The antitrust theory was a monopolization claim, in which the plaintiffs alleged that Humana colluded with the relevant hospitals to give the hospitals a monopoly over the market for Humana insureds. *Id.* at 1475-76. Similar to the franchisees' claim in *Queens City Pizza*, the insureds' antitrust claim defined the "relevant market" to include only those hospital consumers who had Humana insurance policies. In other words, the plaintiffs claimed a submarket whose boundaries depended entirely on a written contract. *Id.* at 1476. And just as the Third Circuit had done in *Queens City Pizza*, we rejected that market definition, holding that explicit contractual provisions limiting Humana insureds to certain hospitals could not form the boundaries of an antitrust submarket. *Id.*

We also concluded that contractual obligations were not a cognizable source of market *power*. In other words, the relevant hospitals lacked market power in the general market for all economically substitutable hospital care; the only reason that they had a "monopoly" over Humana insureds was that the Humana insureds had signed a contract explicitly granting the hospitals that power. *Id.* The antitrust claim therefore failed.

The Supreme Court's opinion in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992), has some characteristics in common with *Queens City Pizza* and *Forsyth*, but it also has some critical differences. The general market at issue in *Eastman Kodak* was the market for long-term service contracts to maintain durable equipment, such as photocopiers and micrographic equipment. *Id.* at 455-56. The Kodak corporation manufactured such equipment, but it also offered replacement parts and long-term service agreements.

The antitrust plaintiffs in *Eastman Kodak* did not allege that Kodak held power in the general market for all such durable-equipment services; they alleged market power only in a submarket consisting of those customers that had already purchased Kodak-brand equipment and that needed replacement parts and services for that particular equipment. *Id.* at 456-59. The antitrust theory was that Kodak was engaging in illegal practices to prevent independent service companies from competing with Kodak in the aftermarket for service of Kodak-brand equipment. Owners of Kodak-brand equipment, the plaintiffs alleged, were forced to purchase replacement parts and services only from the Kodak corporation.

As in *Queens City Pizza* and *Forsyth*, the alleged market was limited to consumers of a particular brand; it included only those consumers who had knowingly and voluntarily purchased Kodak equipment. The boundaries of the relevant market, therefore, depended on the consumers' prior decision to purchase a Kodak-brand product, just as the market boundaries in *Queens City Pizza* depended on the consumers' prior decision to enter a Domino's franchise agreement and the market boundaries in *Forsyth* depended on the consumers' prior decision to purchase a Humana insurance policy. Nevertheless, the Supreme Court held that the definition of the relevant market in *Eastman Kodak* was acceptable. *Id.* at 462-63.

The critical distinction between *Eastman Kodak* and the two circuit court opinions was that the Kodak customers did not knowingly enter a contract that gave Kodak the exclusive right to provide parts and services for the life of the equipment. In other words, the simple purchase of Kodak-brand equipment (unlike the signing of a Domino's franchise agreement or the purchase of a Humana insurance policy) did not constitute a binding contractual agreement to consume Kodak parts and services in the aftermarket. Equally critically, the Supreme Court found that market imperfections, including information and switching costs, prevented consumers from discovering, as they were shopping for equipment, that the

Kodak brand would include a de facto commitment to consume only supracompetitively priced Kodak-brand service contracts. *Id.* at 473-78. The Supreme Court specifically discussed and rejected the possibility that a consumer's decision to purchase Kodak-brand equipment (in an indisputably competitive *equipment* market) was functionally equivalent to the signing of a contractual provision that gave Kodak the exclusive right to service its equipment. The Court rejected that analogy on the ground that the consumers could not, at the time of purchase, reasonably discover that Kodak monopolized the service market and charged supracompetitive prices for its service. *Id.* Kodak's market power in parts and services, therefore, did not arise from a knowing contractual (or quasi-contractual) arrangement.

**[6]** Taking these cases together, three relevant principles emerge. First, the law permits an antitrust claimant to restrict the relevant market to a single brand of the product at issue (as in *Eastman Kodak*). Second, the law prohibits an antitrust claimant from resting on market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant (as in *Queens City Pizza* and *Forsyth*). Third, in determining whether the defendant's market power falls in the *Queens City Pizza* category of contractually-created market power or in the *Eastman Kodak* category of economic market power, the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket. The law permits an inquiry into whether consumers entered into such "contracts" knowing that they were agreeing to such a commitment.

In determining whether this case is more like *Queens City Pizza* and *Forsyth* or more like *Eastman Kodak*, there are four relevant aspects of the complaint.

The first relevant aspect of the complaint is that it alleges the existence of two separate but related markets in intrabrand copier equipment and service. The first market is an initial market for copier leases and copier service, which (as the district court correctly found) is a competitive market in which IKON has no significant market power. The second market is a derivative aftermarket for replacement equipment, which includes markets for lease "buy outs" and for "lease-end service." As in all three of the cited cases, the relevant market here is not the indisputably competitive market in which the consumers first shop for the primary product. It is an aftermarket in which the consumers claim that they should be able to shop for a secondary product.[5] In this case, the primary product is the equipment lease and initial service contract, and the secondary product is the replacement equipment and the lease-end service contract. The complaint alleges that suppliers go through a different economic calculus when competing for consumers of replacement equipment and lease-end service than they do when competing for consumers of initial equipment leases and service contracts.

As noted, all three of the cases involve aftermarkets. The alleged aftermarket in this case, however, is more like the aftermarket in *Eastman Kodak* than the aftermarket in *Queens City Pizza* and *Forsyth* in one critical respect: the aftermarket here is wholly derivative from and dependent on the primary market. The markets for pizza ingredients and paper cups would exist whether or not there was a market for pizza chain franchises, and the market for acute care hospitals would exist whether or not there was a market for health insurance. But the market for durable micrographic equipment parts and services would not exist without the market for durable micro-

---

[5]In *Queens City Pizza*, the primary product was the franchise agreement, and the secondary product was the pizza ingredients. In *Forsyth*, the primary product was the insurance contract, and the secondary product was the hospital care. In *Eastman Kodak*, the primary product was the durable equipment, and the secondary product was the service.

graphic equipment, and the market for replacement copiers and lease-end services would not exist without the market for copier leases and copier services.

[7] The relevance of this point to the legal viability of Newcal's market definition may not be intuitively obvious, but it is nevertheless significant. One of the primary considerations in *Eastman Kodak* was the uniqueness of Kodak-brand replacement parts and the resultant power that Kodak gained in the derivative services market. In other words, Kodak held a natural monopoly in the submarket for Kodak-brand replacement parts, which gave it a unique position in the wholly derivative aftermarket for service contracts. Kodak was then able to exploit that unique position to gain monopoly power in the derivative services market as well, even though its monopoly power in services was neither naturally nor contractually created. Similarly, here, IKON has a contractually-created monopoly over services provided under *original* IKON contracts. That contractually-created monopoly (which, under *Queens City Pizza*, is the power that does not count as "market power" for Sherman Act purposes) then gives IKON a unique relationship with those consumers, and the contractual *relationship* gives IKON a unique position in the wholly derivative aftermarket for replacement equipment and lease-end services. The allegation here is that IKON is, like Kodak, exploiting its unique position—its unique contractual relationship—to gain monopoly power in a derivative aftermarket in which its power is not contractually mandated.

The second relevant aspect of the complaint is that its allegations of illegal restraints of trade and illegal monopolization relate only to the aftermarket, not to the initial market. Newcal does not allege that IKON has restrained trade in the market for initial leases and service agreements, nor does it allege that IKON holds power in the primary market. Newcal alleges that the deceptive and fraudulent "flex" agreements restrain competitors' ability to compete in the derivative aftermarkets for replacement equipment, lease buy-outs, and lease-end ser-

vices. Critically, those flex agreements are not part of the initial market as they were in *Queens City Pizza*. IKON obtains the flex agreements only *after* obtaining an initial lease or contract. The flex agreements, therefore, are (allegedly) part of the separate and derivative aftermarket.

The third relevant aspect of the complaint is its description of the source of IKON's market power. According to the complaint, IKON does not achieve market power in the aftermarket through contractual provisions that it obtains in the initial market. Rather, as noted, its market power allegedly flows from its relationship with its consumers. The contractual relationship (not any contractual provision) gives IKON special access to its consumers, and IKON leverages that relationship to gain flex agreements and lease extensions. In other words, no provision of IKON's initial contract gives it the power to provide replacement equipment, to extend the contract beyond 60 months, to foreclose competitors' buy outs, or to prevent competition in lease-end services. The alleged market power, therefore, is not a contractual power in the same sense that the alleged market power in *Queens City Pizza* and *Forsyth* was a contractual power.

The fourth relevant aspect of the complaint is that it alleges that market imperfections, as well as IKON's fraud and deceit, prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket. Just as the plaintiffs had in *Eastman Kodak*, Newcal offers factual allegations to rebut the economic presumption that IKON consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter an IKON contract. Competition in the initial market, therefore, does not necessarily suffice to discipline anticompetitive practices in the aftermarket.

**[8]** In the end, then, we find that Newcal's allegations are more like the allegations at issue in *Eastman Kodak* than

those at issue in *Queens City Pizza*. This case is not a case in which the alleged market power flows from contractual exclusivity. IKON is not simply enforcing a contractual provision that gives it the exclusive right to provide replacement equipment and lease-end services. Rather, it is leveraging a special relationship with its contracting partners to restrain trade in a wholly derivative aftermarket. We therefore reverse the district court's holding that *Queens City Pizza* and *Forsyth* render Newcal's complaint legally invalid.

**[9]** That holding, however, does not quite end the matter. In considering the legal validity of Newcal's alleged market, we must also determine whether IKON customers constitute a cognizable subset of the aftermarket, such that they qualify as a submarket not only under the general principles from *Eastman Kodak* but also under the specific *Brown Shoe* standard. That is, we have thus far concluded only that there is no *per se* rule against recognizing contractually-created submarkets and that such submarkets are potentially viable when the market at issue is a wholly derivative aftermarket. Even when a submarket is an *Eastman Kodak* submarket, though, it must bear the "practical indicia" of an independent economic entity in order to qualify as a cognizable submarket under *Brown Shoe*. In this case, Newcal's complaint sufficiently alleges that IKON customers constitute a submarket according to all of those practical indicia. Newcal has therefore done enough to survive a Rule 12(b)(6) motion.

Of course, nothing we have said here guarantees that—or even speaks to whether—Newcal's complaint will survive a summary judgment motion. The actual existence of an aftermarket for replacement equipment, lease buy-outs, and lease-end services is a factual question. The actual existence of a separate economic entity (*i.e.* a submarket) that includes only IKON's customers is a factual question. The actual existence of IKON's market power within the alleged submarket is a factual question. IKON's actual leveraging of its contractual relationships (and resultant market power) to foreclose com-

petition in the derivative aftermarket is a factual question. The initial market's actual ability, through cross-elasticity of demand, to discipline anti-competitive conduct in the aftermarket is a factual question. All of these questions remain open for resolution—either for or against Newcal—upon remand, and all of these questions are appropriate matters for resolution on summary judgment if Newcal fails to discover and present evidence to support its allegations. We conclude only that Newcal's allegations state a claim upon which relief could be granted, and we remand on that basis only.

B

**[10]** In addition to arguing that Newcal failed to allege a relevant market, IKON asks us to affirm the district court's dismissal order on the alternative ground that Newcal failed to state claims based on exclusive dealing, tying, restraint of trade, and attempted monopolization. IKON's arguments, however, all hinge on factual disagreements rather than legal deficiencies, such that the arguments do not support affirmance of the Rule 12(b)(6) dismissal.

First, IKON argues that Newcal failed to state a claim for exclusive dealing on the ground that the IKON contracts do not, in fact, contain exclusive dealing provisions. This assertion hinges on a factual question, namely the precise terms of the IKON contracts. Newcal's complaint alleges that "IKON and GE have entered into exclusive dealing arrangements with their IKON Contracts, IKON Amendments and Flexed IKON Contracts[.]" That allegation, which we must accept as true, is enough to survive dismissal under Rule 12(b)(6).

Second, IKON argues that Newcal failed to state a claim for tying because it failed to allege that IKON forces its consumers to accept the tied product. Newcal specifically alleged, however, that IKON has "been able to force purchasers of the tying product who are locked in at the end of the original term of the cost-per-copy lease by the Flexed IKON Contract to

buy the tied product[.]" Once again, that allegation suffices to survive a motion to dismiss. IKON further argues that no set of facts will be available to demonstrate that IKON has the *ability* to force ties on its consumers because it lacks market power in the tying product, namely the replacement copier equipment. In support of that point, IKON cites *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 126 S.Ct. 1281 (2006), for the proposition that a plaintiff must prove "market power in the tying product" in order to establish a tying claim. *Id.* at 1293. IKON is undoubtedly right that New-cal must prove market power in the tying product, but the existence or non-existence of that market power is a factual question. In fact, in *Illinois Tool Works*, the Supreme Court eliminated a legal rule that patent holders would be presumed to hold market power in patented products. The Court held that a finding of monopoly "must be supported by proof of power in the relevant market rather than by a mere presumption thereof." *Id.* at 1291. The Court's reasoning, thus, supports the conclusion that market power is in this case a factual question. Resolution of the market power question on a Rule 12(b)(6) motion is therefore inappropriate in this case.

Third, IKON argues that Newcal's generic restraint of trade claim should be dismissed. IKON's argument on this point simply reiterates its assertion that Newcal failed to allege any viable market. We have already addressed and rejected that argument; IKON offers no independent reason to dismiss Newcal's generic restraint of trade claim.

Fourth, IKON argues that Newcal failed to state its claims of conspiracy to monopolize and attempted monopolization. Once again, this argument simply reiterates the market arguments without providing any independent reason to dismiss the claims.

**[11]** In sum, Newcal's antitrust claims do not fail to state a claim upon which relief may be granted.

### III

The second question on appeal is whether Newcal sufficiently alleged false or misleading statements of fact to support its Lanham Act claim. The district court found that all five of the statements identified in Newcal's complaint were insufficient to support the claim. Because the district court's conclusions with respect to four of those five statements rested on factual findings rather than legal conclusions, we reverse the Rule 12(b)(6) dismissal and remand Newcal's Lanham Act claim.

Under the Lanham Act, a "prima facie case requires a showing that (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2000).

**[12]** Newcal alleged all elements of a Lanham Act violation, specifically listing the following five false or misleading statements of fact: "(a) that IKON [ ] would deliver 'flexibility' in their 'cost-per-copy' contracts and that they would lower copying costs for consumers; (b) that IKON [ ] would deliver 95% up-time service in their IKON Contracts; (c) that original IKON Contracts were intended by IKON to be for a fixed term of sixty (60) months and would expire at the end of that term; (d) that IKON Amendments for sixty (60) months applied only to the changes on the Amendment, not to the entire fleet of IKON [ ] Copier Equipment of the consumer; and (e) that IKON's 'flexing' practices had been

declared legal by [the District] Court in its opinion of December 23, 2004.”

The district court concluded that statement (a) constituted “puffing,” that statements (b) and (c) were not “ ‘false or misleading representations of fact’ at the time they were made,” and that statements (d) and (e) could not “reasonably be said to have been made in ‘a commercial advertisement or promotion.’ ”[6]

First, we agree with and affirm the district court’s conclusion that statement (a) constitutes “puffing.” In *Cook, Perkiss, & Liehe v. Northern California Collection Service, Inc.*, 911 F.2d 242, 245 (9th Cir. 1990), we concluded that the determination of whether an alleged misrepresentation “is a statement of fact” or is instead “mere puffery” is a legal question that may be resolved on a Rule 12(b)(6) motion. A statement is considered puffery if the claim is extremely unlikely to induce consumer reliance. Ultimately, the difference between a statement of fact and mere puffery rests in the specificity or generality of the claim. *Id.* at 246. “The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions.” *Id.* Thus, a statement that is quantifiable, that makes a claim as to the “specific or absolute characteristics of a product,” may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery. *Id.* In this case, statement (a) is not a quantifiable claim and does not describe (or misdescribe) any specific or absolute characteristic of IKON’s service. Rather, it is a general assertion that IKON provides its customers with

---

[6]IKON argues that Newcal waived all of its arguments except those directed at the district court’s first conclusion by failing to argue those points before the district court in its opposition to the motion to dismiss. According to IKON, the only question that Newcal preserved for appeal is the question of whether statement (a) constitutes “puffing.” We disagree. There was sufficient argument in the opposition brief to preserve all of Newcal’s arguments for review.

low costs and with flexibility. That kind of general assertion is classic puffery. The district court, therefore, was correct to conclude that statement (a) could not support Newcal's Lanham Act claim.

The second question we must address is whether statements (b) and (c) were " 'false or misleading statements of fact' at the time they were made." With respect to statement (b), the question of whether IKON does or does not actually "deliver 95% up-time service in their IKON Contracts"—as well as the question of whether it actually had a 95% rate of up-time service at the time that IKON made that statement—are factual questions. Our review is limited to facts alleged in the complaint. The complaint alleges that this statement was false when made, and so it survives 12(b)(6) scrutiny.

With respect to statement (c), IKON correctly points out that other parts of Newcal's complaint allege that initial IKON contracts were limited to 60 months, which would support the inference that statement (c) ("that original IKON Contracts were intended by IKON to be for a fixed term of sixty (60) months and would expire at the end of that term") was true when made. But that inference could be proved false, or the statement could be proved true but misleading. *See Cook, Perkiss, & Liehe*, 911 F.2d at 245. Newcal alleges that the assurance of a 60 month limitation on the contract was misleading since IKON allegedly intended to—and allegedly did—fraudulently extend those contracts. The validity of that statement as an actionable statement therefore may depend on whether IKON knew at the time that it made the statement that it would fraudulently "flex" the contracts beyond their 60 month terms. And the question of IKON's knowledge and intent is a factual question. With respect to statement (c), therefore, there remains a factual question of whether the statement was intentionally *misleading* at the time it was made.

We therefore reverse the district court's holding with respect to statements (b) and (c).

The final question is whether statements (d) and (e) could "reasonably be said to have been made in 'a commercial advertisement or promotion.' " To constitute commercial advertising or promotion, a statement of fact must be:

> (1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (quotation marks omitted). Whether the relevant statements were "disseminated sufficiently to the relevant purchasing public," *id*, may turn out to be true or false, but the allegation suffices for purposes of stating a claim. Newcal alleged that IKON made all five of the alleged false statements "in commercial advertising and promotion of [its] goods and services to all IKON and GE customers[,] . . . by the broad dissemination of pieces of promotional literature to thousands of accounts by IKON's and GE's over 2,000 sales representatives and employees." Newcal must be given an opportunity to prove that the alleged statements were made in commercial advertising.

IKON's citation to *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 465 F.Supp.2d 956 (N.D. Cal. Dec. 1, 2006), does not change this analysis. That case found on a motion for *summary judgment* that the factually-established "handful of statements to customers" did not constitute sufficient dissemination in the industry at issue in that case. On remand, the district court here will be free to reach the same conclusion, but only after Newcal has had an opportunity to present evidence

in support of its allegations and has failed to meet its burden of proof. IKON has offered no citation that would support dismissal as a matter of law.

**[13]** We therefore reverse and remand Newcal's Lanham Act claim. The complaint sufficiently alleges all elements of a Lanham Act violation, including several false statements of fact that were allegedly disseminated to the relevant market's consumers. The district court correctly held that statement (a) constitutes puffery, but statements (b)-(e) should have survived the motion to dismiss and must therefore be remanded for evidentiary development.

## IV

The third question on appeal is whether Newcal has standing to pursue its RICO claim. The district court concluded that it does not. We reverse and remand.

The statutory provision that creates a RICO civil action, 18 U.S.C. § 1964(c), allows "[a]ny person injured in his business or property by reason of a violation of" the RICO statute to bring a civil suit for treble damages. To demonstrate RICO standing, a plaintiff must allege that it suffered an injury to its "business or property," 18 U.S.C. § 1964(c), as a proximate result of the alleged racketeering activity, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992). In other words, RICO standing requires compensable injury and proximate cause.

In this case, Newcal alleges two injuries. First, it claims that IKON's fraud foreclosed "specific named customer accounts" from competition, thereby decreasing Newcal's market share. Second, Newcal claims to have paid a fraudulently inflated price to buy out certain accounts that were under flexed IKON contracts.

**[14]** Relying on *Oscar v. University Students Co-Operative Association*, 965 F.2d 783, 785-86 (9th Cir. 1992) (en banc),

and *Imagineering, Inc. v. Kiewit Pacific Co.*, 976 F.2d 1303, 1311 (9th Cir. 1992), the district court first held that Newcal's alleged injuries are speculative injuries, which were not compensable under RICO. Since the district court issued its order, we have overturned the rules on which the court relied. In *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc), we held that an injury is compensable under RICO if the injury constitutes "harm to a specific business or property interest" and if the alleged business or property interest is cognizable under state law. *Id.* The district court has not had the opportunity to consider *Diaz*. We therefore remand the RICO claim to the district court for reconsideration of the compensable injury requirement under *Diaz*.

[15] In this circuit, three factors are relevant in determining whether a plaintiff has shown proximate cause:

> (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries.

*Ass'n of Wash. Pub. Hosp. Dists. v. Phillip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001). The existence of more-direct victims defeats proximate cause if we can count on those injured parties to "vindicate the law as private attorneys general" or if the existence of other injured parties creates difficulties of apportionment or risks of multiple recovery. *Id. See also Oregon-Laborers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 963-67 (9th Cir. 1999). The three questions here, therefore, must be whether the direct victims of IKON's fraud would be likely to sue IKON, whether the existence of those victims would make it difficult to apportion damages, and whether the existence of those victims would

create a risk of multiple recovery against IKON. Those questions are all factual questions, which we cannot resolve on a Rule 12(b)(6) motion in this case. We therefore remand to the district court for further consideration of the proximate cause requirement under the appropriate standard. *See Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2001) (reversing a Rule 12(b)(6) dismissal because certain proximate cause elements required factual development).

**[16]** IKON also argues, as an alternative basis for affirming the district court's dismissal order, that Newcal failed to allege a RICO enterprise. The definition of "enterprise" in the text of the RICO statute is as follows: " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). We recently held in *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007), that RICO's enterprise element does not require the allegation or proof of any separate organizational structure. Newcal's complaint alleges a sufficient enterprise-in-fact under *Odom*.

Finally, IKON asks us to affirm dismissal on the ground that Newcal failed to allege its fraud allegations with sufficient particularity, as required under Fed. R. Civ. P. 9(b). Specifically, IKON asserts that Newcal failed to identify the false statements of fact that give rise to the fraud allegation. We disagree.

**[17]** Newcal alleged several forms of misrepresentation and deception in which IKON purportedly engaged. Also, the complaint specifically alleges that GE, which bought and enforced some flexed IKON contracts, knew about the fraud and actively profited from the fraud. Because GE allegedly knew about the fraud, participated in gathering profits from the fraud, and did, in fact, profit from the fraud, its specific intent can be inferred. These allegations are sufficient to satisfy Rule 9(b).

V

The last question on appeal is whether the district court abused its discretion when it dismissed Newcal's declaratory complaint without granting leave to amend. We hold that it did.

Newcal sought a declaration that all flexed IKON contracts were void and unenforceable. The district court denied that request on two grounds: (1) that Newcal lacked constitutional standing to bring the action because it lacked a cognizable interest in the enforceability of third-party contracts and (2) that prudential considerations counseled against granting the request because a declaratory judgment would not prevent future litigation.

The district court erred in finding an absence of constitutional standing. Newcal alleged in its declaratory complaint that IKON had threatened to sue Newcal for "interfering with its existing and potential business relationships." Newcal sought a declaration that the business relationships with which it interfered were not legally protectable because they were obtained through fraud.

[18] On that basis, Newcal had a stake in the controversy even though it was not a party to the relevant contracts. *Cf. Mardian Equipment Co. v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 2456214, at *5 (D. Ariz. Aug. 22, 2006) ("Here, Plaintiff and St. Paul have no adverse legal interests."); *Meccatech v. Kiser*, 2006 WL 2690063, at *5 & n.6 (D. Neb. Sept. 18, 2006) (holding that the declaratory plaintiff faced "no threat of pecuniary loss"). We have held under similar circumstances that the threat of suit is enough to create standing, such that the threatened party may seek a declaration that the threatening party's putative rights are invalid. *See, e.g., Societe de Conditionnement en Aluminium v. Hunter Engineering Co., Inc.*, 655 F.2d 938 (9th Cir. 1981). The district

court therefore erred in holding that Newcal lacked constitutional standing to bring its declaratory complaint.

**[19]** For similar reasons, the district court erred in holding that the grant of declaratory relief would serve no useful purpose. The district court cited *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985), for the proposition that a court should deny declaratory relief "when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." In *Washington*, the court below had issued a declaratory judgment that the State of Washington owed a general obligation and duty under treaty "to refrain from degrading or authorizing the degradation of the fish habitat to an extent that would deprive the treaty Indians of their moderate living needs." *Id.* at 1355. The Ninth Circuit vacated that declaratory judgment on the ground that it was too broad; it was not based "upon concrete facts which underlie a dispute in a particular case." *Id.* at 1357.

In this case, even a broad declaration that IKON's fraudulent conduct has rendered invalid all of its fraudulently procured contracts would be a declaration that is grounded in the particular facts of the controversy before the court, namely Newcal's allegedly tortious interference with all such current and prospective contracts. Furthermore, that declaration would meet the test that the district court announced. It would "clarify or settle the legal relations in issue" (*i.e.* IKON's legal right to recover from Newcal for tortious interference), and it would "afford relief from the uncertainty faced by the parties" (*i.e.* both Newcal's and IKON's uncertainty as to the legal validity of IKON's tortious interference theory).

**[20]** We therefore reverse the district court's dismissal of Newcal's declaratory complaint and remand. The threat of litigation is a cognizable injury for standing purposes, and the

grant of declaratory relief would not be inadvisable under the identified prudential considerations.

**REVERSED and REMANDED.**