**BLIZZARD ENTERTAINMENT INC.**

v.

**CEILING FAN SOFTWARE
LLC, et al.**

**Case No. SACV 12–00144 JVS(RNBx).**

United States District Court,
C.D. California.

April 16, 2013.

Daniel A. Kohler, Elaine K. Kim, Jean P. Nogues, Karin G. Pagnanelli, Marc Ellis Mayer, Mitchell Silberberg and Knupp LLP, Los Angeles, CA, for Blizzard Entertainment Inc.

Christopher W. Arledge, Peter R. Afrasiabi, One LLP, Newport Beach, CA, Lance C. Venable, Venable Campillo Logan & Meaney PC, Phoenix, AZ, for Ceiling Fan Software LLC et al.

### Order re: Plaintiff's Motion to Dismiss Counterclaims

JAMES V. SELNA, District Judge.

This action arises out of Defendants' marketing of a software program designed to run in conjunction with Plaintiff's online computer role-playing game. Plaintiff Blizzard Entertainment, Inc. ("Blizzard") moves to dismiss the First Amended Counterclaims ("FACC") asserted by Defendants Ceiling Fan Software, LLC ("CF"), Brian Becker ("Becker"), and Stanton Fraser ("Fraser") (collectively, "Defendants"). (Mot., Docket No. 69; First Amended Answer and Amended Counterclaims ("FACC"), Docket No. 67.) Defendants filed a timely opposition. (Opp'n, Docket No. 72.) Blizzard filed a reply.[1] (Reply, Docket No. 75.) For the

---

1. Blizzard also filed a Request for Judicial Notice with its motion and a Supplemental Request for Judicial Notice with its reply. (Docket Nos. 69–1 & 75.) To the extent the Court cites to documents submitted in the Requests, it takes judicial notice of those documents because Defendants' FACC incorporates those documents by reference. *See Knievel v. ESPN, Inc.*, 393 F.3d 1068, 1076 (9th Cir.2005) (judicial notice is appropriate where plaintiff's claim depends on the contents of the document).

following reasons, the Court GRANTS the motion.

## I. *Background*

### A. Procedural History

Blizzard filed this action against Defendants based on Defendants' development and sale of software bots that simulate participation in Blizzard's online computer role-playing game "World of Warcraft" ("WoW"). (First Amended Compl., Docket No. 30.) Its claims against Defendants are for intentional interference with contractual relations, breach of contract, unjust enrichment, and unfair competition. (*Id.*) Defendants counterclaimed for antitrust violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, unfair competition in violation of California Business & Professions Code §§ 17200 *et seq.* ("UCL"), and declaratory relief. (*See* Answer and Counterclaims, Docket No. 40.)

Blizzard filed a motion to dismiss the initial counterclaims asserted by Defendants. On January 7, 2013, the Court granted Blizzard's motion to dismiss the initial counterclaims asserted by Defendants, holding that the antitrust and unfair competition claims failed because "Defendants have not properly defined a product market" because "the allegations in the counterclaims fail to show how such a broad range of products are reasonably interchangeable with CF's bots."[2] (Order Granting Motion to Dismiss 4, Docket No. 63.)

On February 8, 2013, Defendants filed their FACC and amended their allegations for the relevant market. (Docket No. 67.) Blizzard now moves to dismiss the counterclaims in the FACC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

### B. Factual Background

The relevant allegations are almost identical to those set forth in the Court's dismissal order, notwithstanding Defendants' new market allegations. Blizzard developed and sells WoW. (FACC ¶ 7.) By playing WoW online, players assume a character that advances and upgrades through various levels, which enable them to access new content. (*Id.* ¶¶ 8–10.) Defendants allege that to reach the ultimate goal of level 85, a player must spend a substantial amount of time playing WoW. (*Id.* ¶ 10.) Therefore, Blizzard has created a significant demand for WoW players who wish to reach level 85 but cannot devote the time necessary to do so. (*Id.* ¶ 11.) In response, a substantial market has been established by third-party software developers to create "bot" programs ("bots" or "bot programs"), which work to simulate participation in WoW, thereby advancing players through levels without as much active game-time playing as would be otherwise required. (*Id.* ¶¶ 12–14.) Responding to this significant demand for WoW bot programs, CF developed and sells two such software bots known as "Pocket Gnome" and "Shadow Bot." (*Id.* ¶ 17.)

When it developed its bots, CF was aware that Blizzard's End User License Agreement ("EULA") and Terms of Use ("TOU") prohibit its users from using third-party bot software programs to decrease the time it takes to advance through levels. (*Id.* ¶¶ 15–19.) The EULA and TOU expressly prohibit licensees from using any unapproved third-party add-on software and hardware, including "bot" software. (*Id.* ¶¶ 28–29.) Blizzard does not normally authorize any efforts by players who level up their avatars by using third-party add-on bot software programs. (*Id.* ¶ 15.) Defendants

---

**2.** The Court dismissed Defendants' declaratory relief counterclaims with prejudice.

claim that Blizzard's use of its copyright, EULA, and TOU are anticompetitive actions in violation of antitrust laws. (*Id.* ¶¶ 22–32.)

### 1. The Relevant Market

The FACC now defines the affected "relevant market" as "the aftermarket for add-on hardware and software specific to the WoW that enables WoW players to advance their character levels at a faster-than-normal rate." (*Id.* ¶ 34.) It alleges that any software product that enables a person to advance its WoW character can be interchangeable with a bot. (*Id.* ¶ 36.) Blizzard offers such products for leveling characters faster in WoW either directly or through licensing agreements with third parties. (*Id.* ¶ 37.) Blizzard develops, markets, and sells its own software that are "market substitutes for the 'bot' software in the market." (*Id.* ¶ 32.) These products include keyboards and mice that are pre-programmed to automate keystrokes within WoW, and Blizzard-promoted services such as "Recruit a Friend" or "Scroll of Resurrection" that enable WoW players to advance up to three times the normal rate or advance a character immediately to the top level in the game. (*Id.* ¶ 38.) Defendants allege that any WoW player who wishes to advance its character at a faster-than-normal rate could choose from those options or purchase CF's bot software. (*Id.* ¶ 40.)

### 2. Anticompetitive Behavior

Defendants allege antitrust violations, including monopolization or attempted monopolization in violation of Section 2 of the Sherman Act. Defendants allege that Blizzard and its licensees completely control the relevant market. (*Id.* ¶ 35.) They allege that Blizzard maintains control by quashing any attempt by third-party developers to enter the WoW add-on aftermarket through a number of specific anticompetitive acts. (*Id.* ¶¶ 22–32, 55.) These acts include: (1) requiring through its EULA and TOU that any individual who wishes to play WoW use only hardware or software add-ons sold or licensed by Blizzard; (2) restricting the interoperability of third-party add-on hardware or software through technology barriers; (3) disabling such third-party add-ons through software updates; (4) promoting its own products to advance WoW play while precluding any third parties from selling competing products; (5) threatening to sue entities that sell unauthorized add-ons that interoperate with WoW despite having no contractual or business relationship with the entities; and (6) selectively suing such entities. (*Id.* ¶¶ 44, 55.) They allege that these acts reduce the choices available to consumers and bar access to high-quality add-ons. (*Id.* ¶ 57.) Moreover, Blizzard intentionally places these barriers to entry to allow them to supply its own aftermarket products. (*Id.* ¶ 58.)

Moreover, Defendants allege that Blizzard violates the Sherman Act and Clayton Act by "tying" the sale of its WoW software on the condition that users of WoW will not purchase any unauthorized third-party hardware or software. (*Id.* ¶ 66.) They allege that Blizzard controls at least 62 percent of the entire massive multiplayer online role-playing game market. (*Id.* ¶ 65.) Through this tying arrangement, Blizzard attempts to monopolize the relevant aftermarket for WoW add-ons. (*Id.* ¶ 74.)

## II. *Legal Standard*

As a counter-defendant, Blizzard moves to dismiss Defendants' FACC for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Mot.)

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

In resolving a Rule 12(b)(6) motion under *Twombly,* the Court must follow a two-pronged approach. First, the Court must accept all well-pleaded factual allegations as true, but "[t]hread-bare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Most succinctly stated, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). "In keeping with these principles[,] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937.

Second, assuming the veracity of well-pleaded factual allegations, the Court must "determine whether they plausibly give rise to an entitlement to relief." *Id.* This determination is context-specific, requiring the Court to draw on its experience and common sense, but there is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.*

## III. *Discussion*

Defendants assert counterclaims for monopolization in violation of Section 2 of the Sherman Act, and for "tying" under the Sherman and Clayton Acts. (*See* FACC ¶¶ 47–77.) The Court considers whether the threshold market allegations are sufficient.

■■■ As the Court summarized in its previous order, "[i]n order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Solution,* 513 F.3d 1038, 1044 (9th Cir.2008). The relevant-market inquiry does not differ for Section 1 and Section 2 of the Sherman Act, or Section 3 of the Clayton Act. *See id.* at 1044 n. 3; *Apple Inc. v. Psystar Corp.,* 586 F.Supp.2d 1190, 1196 (N.D.Cal. 2008). The relevant market must be a product market. *Newcal,* 513 F.3d at 1045. A properly defined product market "includes a pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Oltz v. St. Peter's Cmty. Hosp.,* 861 F.2d 1440, 1446 (9th Cir.1988). An antitrust complaint can be dismissed if its relevant market definition is "facially unsustainable." *Newcal,* 513 F.3d at 1045. The Court thus discusses whether Defendants have sufficiently alleged that Blizzard has power within a relevant market.

### A. Relevant Product Market

■■ The alleged relevant market is defined as "the aftermarket for add-on hardware and software specific to the WoW that enables WoW players to advance their character levels at a faster-than-normal rate." (FACC ¶ 34.) Blizzard claims that the newly alleged relevant market is "too conclusory, vague, and broad to meet the pleading standards" because products in the defined aftermarket are not "roughly equivalent" to CF's bots. (Mot. Br. 10–

11.) It contends that the CF bots *fully* automate gameplay of WoW and is not a product for which even a WoW-branded keyboard and mouse can be reasonably substituted. (*Id.* at 10.) Similarly, Blizzard's "Recruit a Friend" and "Scroll of Resurrection" promotions are merely incentive programs that do not enable users to automate play of WoW, and are also not reasonably interchangeable with CF's bots. (*Id.* at 11.) Thus, it contends that Defendants have failed to identify a credible and discrete market consisting only of reasonable substitutes for its bots, and has failed to provide at least some facts to support that market definition. (*Id.* at 12.)

In opposition, Defendants argue that, taking its allegations as true, it has met the plausibility standard by alleging that its bots are interchangeable with the other products included in its relevant market definition. (Opp'n Br. 6–7.) Defendants point out that market allegations do not need to be pled with specificity and will survive unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. *See Newcal,* 513 F.3d at 1045. Moreover, the validity of the "relevant market" is typically a factual element rather than a legal element, and thus may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial. *Id.*

The Court agrees with Defendants and finds that the newly alleged relevant market definition is not implausible on its face, unlike the overbroad allegations in Defendants' original counterclaims. The inquiry into whether the special keyboards, mice,

and promotional service programs that "advance play" are "reasonably interchangeable" with the bots is a factual issue that cannot be determined at the pleading stage. *See Todd v. Exxon Corp.,* 275 F.3d 191, 200–02 (2d Cir.2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market."). Taking the allegations in the FACC as true, it is plausible that the bot programs are interchangeable with other "hardware and software specific to the WoW that enables WoW players to advance their character levels at a faster-than-normal rate." (*See* FACC ¶ 33.) Because the relevant market definition is not "facially unsustainable," it survives the pleading stage. *See Newcal,* 513 F.3d at 1045.

### B. Blizzard's Market Power in the Relevant "Aftermarket"

██ However, the Court finds that, despite pleading a sufficiently defined product market with interchangeable products, the market allegations still fail. Although the law recognizes that an antitrust claimant can allege a single-brand aftermarket, *see Newcal,* 513 F.3d at 1048, such as an aftermarket for WoW only, any market power Blizzard has over the WoW aftermarket is the result of restrictive contractual provisions in its EULA and TOU. These contractual obligations are not a cognizable source of market power.[3] *See id.* at 1047.

Blizzard raises this argument in its motion, contending that Defendants cannot

---

**3.** The Court notes that, contrary to Blizzard's repeated assertion that Defendants have failed to plead that Blizzard has market power or actually competes in the relevant aftermarket for products advancing WoW play (*see* Mot. Br. 13, 15, 16), the FACC alleges that "Blizzard and its licensees completely control the distinct aftermarket" and that Blizzard participates in the aftermarket by selling its own

products for leveling characters faster in WoW and by licensing third parties to sell custom hardware that interoperates with WoW (FACC ¶¶ 32, 35, 37, 51). At the pleading stage, such allegations of market power are sufficient. Regardless, the market power allegations fail because of the source of this power, as discussed by the Court above.

establish antitrust claims based on its users' voluntary consent to the EULA and TOU.[4] (Mot. Br. 22–23.) Although Blizzard does not argue this point in the market power analysis, the Court finds that this discussion is applicable to whether the market power requirement is established.[5] Blizzard cites *Newcal, Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir.1997), and *Apple Inc. v. Psystar Corp.*, 586 F.Supp.2d 1190, 1201 (N.D.Cal.2008), to show that Defendants cannot base its claims on the aftermarket restrictions. (*See* Opp'n Br. 17.) These cases explain that the law prohibits an antitrust claimant from asserting an antitrust claim "resting on market *power* that arises solely from contractual rights that customers knowingly and voluntarily gave to the defendant" when they purchased the initial tying product. *Newcal*, 513 F.3d at 1048 (referring to the *Queen City Pizza* line of cases). For example, in *Queen City Pizza*, the Third Circuit rejected a single brand aftermarket relating to pizza-making ingredients for Domino's franchisees. This was because the franchise agreement explicitly required franchisees to purchase pizza ingredients from Domino's or authorized vendors. *Id.* at 1046–47. There, the contractual provision did not change the fundamental nature of the inputs, which remained economically substitutable with other brands of the same inputs, the provision merely changed the plaintiffs' legal freedom to choose substitutes. The Third Circuit held that the contrac-

tually created difference among otherwise-substitutable products was insufficient to create an economically distinct antitrust submarket. *Id.* at 1046.

*Newcal* also cites *Forsyth v. Humana*, 114 F.3d 1467, 1476 (9th Cir.1997), in which the Ninth Circuit rejected a claim for monopolization of the market for hospital services for a single company's insureds because the purported restraint arose from contract provisions disclosed in advance in the plaintiff's insurance policies. The theory there was that the insurance company colluded with hospitals in the form of kickbacks to give the hospitals a monopoly over the market. However, these contractual obligations were not a cognizable source of market power because the only reason why the hospital had a "monopoly" over the insureds was because the insureds had signed a contract granting those hospitals that power. *Id.* at 1476; *see Newcal*, 513 F.3d at 1047. Furthermore, in *Psystar*, the court held that the defendant had failed to plead a plausible aftermarket for hardware that could be used with the Mac OS operating system because through "its End User License Agreement and other means, Apple specifically restricts the use of Mac OS to Apple-labeled computer hardware systems," and "customers, therefore, knowingly agree to the challenged restraint." *See Psystar*, 586 F.Supp.2d at 1201.

*Newcal* distinguished those cases from that in *Eastman Kodak v. Image Techni-*

---

**4.** It is unclear if Blizzard sought to apply this argument to all of the antitrust counterclaims or only to the "tying" claim. In its reply brief, the argument is limited to the tying claim section. (*See* Reply Br. 15–17.) However, given that alleging market power is a requirement for Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act, it is appropriate to apply this analysis to all of the antitrust claims here. *See Psystar*, 586 F.Supp.2d at 1196–97 (analyzing the market

definition considerations in *Newcal* as a threshold question for Sherman Act and Clayton Act claims).

**5.** Some cases discuss this contractual issue in the overall "market definition" analysis, *see Psystar*, 586 F.Supp.2d at 1200–03, but the Court finds that it is more appropriately applied to more specific "market power" analysis.

cal Services, Inc., 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), in which consumers did *not* know that, in purchasing the Kodak-brand equipment, they were agreeing to the equivalent of a contractual commitment giving Kodak an agreed-upon right to monopolize its consumers in the aftermarket for Kodak parts and services. 513 F.3d at 1048. The antitrust plaintiffs alleged that Kodak had market power in the submarket consisting of customers that had already purchased Kodak-brand equipment and needed replacement parts and services for that already-bought equipment. 504 U.S. at 456–59, 112 S.Ct. 2072. Kodak allegedly engaged in illegal practices to prevent third-party companies from competing with Kodak in the aftermarket for service of the Kodak-brand equipment. *Id.* Such an arrangement can be the basis for antitrust claim. Unlike in *Psystar*, the customers in *Eastman Kodak*

did not knowingly bind themselves to a single brand of the aftermarket. *See Psystar*, 586 F.Supp.2d at 1201. "Only after were they 'locked in' to Kodak equipment were they forced to evaluate costs in the parts and services markets." *Id.*

After discussing *Eastman Kodak*, *Queen City Pizza*, and *Forsyth*, the court in *Newcal* determined that the plaintiff's allegations were more like those at issue in *Eastman Kodak*. 513 F.3d at 1050. The court thus found that the complaint stated a valid antitrust claim. *Id.* This Court similarly analyzes whether the situation here is more like the aftermarket in the *Queen City Pizza* line of cases or the *Eastman Kodak* and *Newcal* cases. The Ninth Circuit in *Newcal* considered four relevant aspects of the complaint to consider whether its plaintiff's allegations were more like the allegations in *Queen City Pizza* or *Eastman Kodak*.[6] The Court considers the same aspects.

6. Defendants argue that the main distinction between *Eastman Kodak* and *Queen City Pizza* is whether a monopoly existed when the alleged tying contract was executed. (Opp'n Br. 19.) The *Queen City Pizza* line of cases involved competition among pizza franchises in the initial market, while in *Eastman Kodak*, consumers had already purchased Kodak's copiers and thus Kodak was in a monopoly position. (*Id.* at 19–2.) They argue that because Blizzard's copyright prevents others from playing WoW on third-party servers and the market does not offer substitutes for WoW, the case is akin to *Eastman Kodak* because a monopoly for WoW exists prior to any potential licensee signing the contract. (*Id.* at 20.) But that is not plausible based on the allegations here. Even though there might not be an identical game on the market, the Court is not convinced that there are no market substitutes for WoW. The FACC itself alleges that Blizzard has control over approximately 62 percent of the multiplayer online role-playing game market. (*See* FACC ¶ 65.) Thus, Defendants' own pleading admits that there are alternatives in the market for role-playing games. Moreover, in *Psystar*, the court rejected the theory that Apple's Mac OS operating system was a single-brand prod-

uct market. 586 F.Supp.2d at 1198. The court noted that, although in theory it may be possible, in rare and unforeseen circumstances, that a relevant market may consist of only one product, "the pleadings, however, fail to allege facts plausibly supporting the counterintuitive claim that Apple's operating system is so unique that it suffers *no* actual or potential competitors." *Id.* The same conclusion applies to Defendants' pleadings. Thus, this situation is actually more like that in *Queen City Pizza*. If players so desire to use bots or bot-like substitutes, they could choose to play online role-playing games that do not have agreements prohibiting the use of unapproved third-party programs or bots.

In the hearing for this motion on April 15, 2013, counsel for Defendants argued that WoW is so "unique" that there is no market substitute for WoW—thus, users have no choice but to sign WoW's contracts, making it analogous to being "locked in" such as in *Eastman Kodak*. However, *Newcal* or *Eastman Kodak* did not contemplate such a situation in which customers were forced to purchase an *initial* product, nor have Defendants provided any case in which this occurred. Moreover, as *Psystar* explains, "[A] company does not violate the Sherman Act by virtue of

First, *Newcal* considered whether "the aftermarket here is wholly derivative from and dependent on the primary market." *Id.* at 1049. Here, the alleged "tied" aftermarket is more like the aftermarket in *Eastman Kodak* because the market for WoW add-ons would not exist without the market for online role-playing games. *See id.* This is unlike *Queen City Pizza*, because the market for pizza ingredients and paper cups would exist even without a market for pizza chain franchises. *See id.* However, *Newcal* further elaborates that the relevance of this point is that Kodak, using its unique contractual relationship with its customers, gained monopoly power in the derivative aftermarket in which its power was *not* contractually mandated. *Id.* at 1050. Therefore, whether the aftermarket for WoW add-ons is wholly derivative is not the key issue. The issue is whether market power in that derivative aftermarket was contractually mandated. From the allegations, it is clear that the EULA and TOU were contracts restricting the aftermarket to only Blizzard-authorized software or hardware. Thus, this element of the complaint is more analogous to the contractually created monopolies in *Queen City Pizza* and *Forsyth*.

Second, *Newcal* considered whether the allegations of illegal anticompetitive acts related only to the aftermarket and not the initial market. In *Newcal*, the plaintiff alleged that the defendant obtained the allegedly illegal agreements only *after* obtaining an initial lease or contract. *Id.* at 1050. Thus, the agreements were allegedly a part of the separate and derivative aftermarket. *Id.* This is unlike the situation in *Queen City Pizza*, in which the franchise agreement explicitly provided that Domino's franchisees could only make

their pizzas with Domino's-approved ingredients and supplies. *Queen City Pizza*, 124 F.3d at 433–45. Thus, in *Queen City Pizza*, the exclusivity agreement was part of the initial market. *Newcal*, 513 F.3d at 1050. The Court finds that Blizzard's EULA and TOU, which expressly prohibit its licensees from using unauthorized third-party add-on software and hardware, is more akin to the situation in *Queen City Pizza*. The FACC does not allege that the those two agreements are signed as part of a separate and derivative aftermarket. In fact, the FACC states that Blizzard sells copies of its WoW software to individuals "only after agreeing to its EULA and TOU." (FACC ¶ 24.)

Third, the *Newcal* court looked to the description of the source of the defendant's market power. 513 F.3d at 1050. Similarly, this inquiry is whether the market power is derived from contractual *provisions* it obtained in the initial market, as in *Queen City Pizza*, or through the contractual *relationship* it has with its consumers, as in *Eastman Kodak*. *Id.* The Court finds that Blizzard's alleged market power in the aftermarket for WoW add-ons is derived from the contractual provisions, the EULA and TOU, that it made users sign in the initial market. There are no allegations here that it leveraged its existing relationship with users to gain power over the aftermarket for WoW add-ons. Thus, in that regard the situation is more like *Queen City Pizza*.

The fourth and last relevant aspect of the complaint is whether it alleges market imperfections such as those found in *Eastman Kodak*, *i.e.* allegations to rebut the economic presumption that consumers made a knowing choice to restrict their

---

the natural monopoly it holds over its own product." *Id.* (quoting *Green Cnty. Food Market, Inc. v. Bottling Grp.*, 371 F.3d 1275, 1282 (10th Cir.2004)). And "[e]ven where brand

loyalty is intense, courts reject the argument that a single branded product constitutes a relevant argument." *Id.* (quoting *Green Cnty.*, 371 F.3d at 1282).

aftermarket options when they decide to sign the initial contract. *Id.* In *Eastman Kodak*, consumers purchased Kodak-brand products without the knowledge that Kodak would then later make it more difficult for third-party companies to provide services for Kodak machines, essentially forcing customers to use Kodak for aftermarket services. 504 U.S. at 458, 112 S.Ct. 2072. The high information costs and switching costs prevented customers from considering their choices at the time of original purchase. *Id.* at 475–78. Here, nothing in the FACC alleges that market imperfections prevented users from discovering the restrictions at the outset. Again, the situation is more like the aftermarket found in *Psystar*. There, customers purchasing Apple's Mac OS operating system were restricted to using it only on Apple computers. *See Psystar*, 586 F.Supp.2d at 1201. Apple was entitled to do have their customers agree to this condition, and so is Blizzard. *See id.* Moreover, the language in WoW's terms is as clear as the language in *Psystar*. Here, when users purchased WoW, they agreed,[7] by signing both the EULA and TOU, not to "use cheats, automation software (bots), hacks, mods or any other unauthorized third-party software designed to modify the World of Warcraft experience." (Supplemental Request for Judicial Notice, Ex. 5, at 1; Ex. 6, at 1.) This is similar to the unequivocal language in Apple's agreement. *See Psystar*, 586 F.Supp.2d at 1194 ("You agree not to install, use or run the Apple Software on any non-Apple-Labeled computer or enable another to do so."); *cf. Datel Holdings Ltd. v. Microsoft Corp.*, 712 F.Supp.2d 974, 989

(N.D.Cal.2010) (because ambiguous warranty language made it "highly unlikely that a customer purchasing a Xbox 360 console would understand the contract as prohibiting unauthorized accessories," the alleged monopoly on the aftermarket was not based on a contractual commitment). These explicit agreements refute the possibility that market imperfections confused WoW users' knowledge of the aftermarket restrictions.

In sum, the principles in *Queen City Pizza*, *Psystar*, and *Forsyth* apply because the FACC does not allege a situation in which Blizzard "is leveraging a special relationship with its contracting partners to restrain trade in a wholly derivative aftermarket," *Newcal*, 513 F.3d at 1050, but one in which "alleged market power flows from contractual exclusivity," *id.* Based on the allegations in the FACC, users agreed to the terms of the EULA and TOU during the initial contract they sign with Blizzard regarding the use of WoW. Blizzard is entitled to condition the use of WoW on such restrictions, and any resulting market power in the aftermarket cannot be the basis for antitrust claims. The only reason why Blizzard or its licensees allegedly hold market power in the aftermarket is because Blizzard users agree not to use any *unauthorized* WoW add-ons. It can be inferred that users therefore agree to only use *authorized* WoW add-ons that advance play, and agreeing to this inherently gives Blizzard power over any market for such products. Based on the case law discussed, it is clear that such a contractually

---

7. Defendants also claim that Blizzard requires users to sign the EULA or TOU after they have already purchased the product. But it appears that the weight of authority is such that shrinkwrap licenses are enforceable. *See Datel Holdings Ltd. v. Microsoft Corp.*, 712 F.Supp.2d 974, 989 (N.D.Cal.2010) (citing authorities); *Meridian Project Sys., Inc.*

*v. Hardin Constr. Co., LLC*, 426 F.Supp.2d 1101, 1106–07 (E.D.Cal.2006) (considering cases and finding that a EULA is an enforceable contract); *see also Psystar*, 586 F.Supp.2d at 1202 (the restriction in the EULA was fully disclosed and expressly agreed upon).

mandated monopoly over an aftermarket is not a legally cognizable market.

 Because the market power allegations fail, Defendants have not adequately plead antitrust counterclaims under the Sherman and Clayton Acts.[8] Moreover, since Defendants' UCL counterclaim is based those antitrust claims, that counterclaim also fails.

## IV. *Conclusion*

For the foregoing reasons, the motion to dismiss is GRANTED with prejudice.

IT IS SO ORDERED.

---

[8]. The "tying" claims under the Sherman Act and Clayton Act fail because tying "generally requires that the defendant's economic power be derived from the market, and not from a contractual relationship that the plaintiff has entered into voluntarily." *See Rick–Mik Enters., Inc. v. Equilon, Enters. LLC*, 532 F.3d 963, 973 (9th Cir.2008). This is clearly not the case, as discussed.

As for Defendants' monopolization claim under Section 2 of the Sherman Act, the claim fails because of the threshold requirement of alleging market power. Even if that requirement were met, the Court notes that none the alleged "anticompetitive acts" that comprise of the monopolization claim are sufficient. First, the use of the EULA and TOU to prohibit third-party programs has already been discussed at length. Such contractual restrictions cannot be anticompetitive under the circumstances here. Moreover, Defendants' allegations based on Blizzard's threats to sue or its lawsuits are barred under the *Noerr–Pennington* doctrine because Defendants do not allege that the lawsuits are a "sham," objectively baseless, or brought in bad faith. *See Prof'l Real Estate Investors v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Furthermore, the authority for Blizzard to use "technological barriers" and software updates used to restrict or disable third-party software is derived from its EULA and TOU, and amounts to no more than policing the restrictions to which the purchasers agreed to upfront. Blizzard is also allowed to promote products that it does authorize because that is not barred by the agreements. In sum, none of the alleged conduct is sufficient to meet a Section 2 monopolization claim.