SiteLink Software, LLC v. Red Nova Labs, Inc., 2016 NCBC 43.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 9922

SITELINK SOFTWARE, LLC,

        Plaintiff,

v.

RED NOVA LABS, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)

**ORDER & OPINION**

{1}     THIS MATTER is before the Court on Plaintiff SiteLink Software, LLC's Motion to Dismiss Counterclaims of Defendant Red Nova Labs, Inc. ("Motion"), brought under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)").  For the reasons discussed below, the Court GRANTS the Motion and DISMISSES the challenged counterclaims without prejudice.

> *Daughtry, Woodard, Lawrence & Starling by Luther D. Starling, Jr. for Plaintiff.*

> *Morningstar Law Group by W. Swain Wood, J. Christopher Jackson, and John T. Kivus for Defendant.*

Gale, Chief Judge.

## I.    INTRODUCTION

{2}     This lawsuit is between two companies that develop and market facility-management software for the self-storage industry.  The dispute centers on the ability of Red Nova Labs, Inc. ("Red Nova") and its customers to access SiteLink Software, LLC's ("SiteLink") application-programming interface ("API") and underlying database.

{3}     SiteLink issues licenses to use its API and facility-management software, but conditions those licenses on the user's agreement not to purchase any

product or service from SiteLink's competitors in the self-storage management-software industry, including Red Nova.

{4}     SiteLink contends that Red Nova improperly accessed SiteLink's API by competing with SiteLink while the API license agreement was still in place and by later accessing the API without SiteLink's consent.  Red Nova claims that SiteLink's API licensing agreement imposes a restraint of trade in violation of North Carolina's antitrust laws, and that SiteLink has engaged in unfair methods of competition, including tortiously interfering with Red Nova's contracts.

## II.     PROCEDURAL HISTORY

{5}     SiteLink initiated this action on July 24, 2014, by filing a verified complaint in Wake County District Court.  On September 29, 2014, Red Nova filed an answer, counterclaims, and a motion to transfer the matter to Wake County Superior Court.

{6}     The district court entered a consent order to transfer the case to the superior-court division on October 28, 2014.  That same day, Red Nova filed a notice of designation, and the matter was designated as a mandatory complex business case.  The case was assigned to the undersigned on October 29, 2014.

{7}     The Court entered a Consent Preliminary Injunction on May 4, 2015.

{8}     SiteLink filed its Amended Verified Complaint for Permanent Injunction and Other Relief ("Amended Complaint") on August 4, 2015.

{9}     Red Nova filed its answer to the Amended Complaint on August 14, 2015, along with counterclaims for (1) tortious interference with contract, (2) anticipatory repudiation of contract, (3) defamation, and (4) unfair and deceptive trade practices and antitrust violations under sections 75-1, 75-1.1, 75-2, and 75-2.1 of the North Carolina General Statutes, N.C. Gen. Stat. §§ 75-1, -1.1, -2, -2.1 (2015).

{10}     SiteLink filed its Motion to dismiss some but not all of Red Nova's counterclaims on September 11, 2015.  In particular, the Motion targets Red Nova's counterclaims that assert violations of sections 75-1, 75-2, and 75-2.1 (the "antitrust claims"); violations of section 75-1.1, to the extent that claim is based on SiteLink's

API licensing agreement; and claims for tortious interference with contract and anticipatory repudiation of contract, to the extent those claims are based on SiteLink's API licensing agreement.

{11} Red Nova filed an amended answer and counterclaims on November 25, 2015, for the sole purpose of amending the factual allegations relating to its defamation claim.[1]

{12} The Motion has been fully briefed, argued, and is ripe for ruling.

## III. STATEMENT OF FACTS

### A. The Parties

{13} SiteLink is a North Carolina limited-liability company with a principal place of business located in Wake County, North Carolina.

{14} Red Nova is a Kansas corporation with a principal place of business located in Johnson County, Kansas.

{15} Both SiteLink and Red Nova provide facility-management software to clients that own or operate self-storage facilities.

### B. Facility-Management Software in the Self-Storage Industry

{16} The self-storage industry comprises storage-facility owners and operators who rent storage space to consumers. (Def.'s Am. Answer, Defenses, and Countercls. to Pl.'s First Am. Compl. ("Am. Countercls.") ¶ 14.) Storage-facility owners and operators use software technology to perform a variety of functions, including internal office tasks and external customer-facing operations. (Am. Countercls. ¶ 15.)

{17} Less than half of all self-storage-facility operators use customized, facility-specific management software to manage their internal office functions.

---

[1] SiteLink moved to dismiss the defamation counterclaim in its Motion. After the Motion was filed, Red Nova amended its defamation counterclaim to add more-specific factual allegations. SiteLink has withdrawn its Motion as to that claim. Because the amendment modified only the defamation claim, the Court allowed the parties to proceed with briefing and oral argument on the Motion, even though the filing of an amended pleading ordinarily would moot an earlier-filed motion to dismiss that pleading.

Red Nova refers to this type of software as facility-management software ("FMS").[2] (Am. Countercls. ¶ 15.)

{18}     SiteLink has provided an FMS package since 2006 and currently provides FMS to approximately eleven thousand facility locations, which equals "approximately 35–40% of the addressable market of self-storage facilities in the United States." (Am. Countercls. ¶ 12.) The Court understands that market to include the portion of self-storage-facility owners or operators that use some type of facility- or business-management software, but not the self-storage facility owners and operators that use less-specialized software, such as a noncustomized database or accounting program.

{19}     Apart from FMS packages, self-storage-facility owners and operators use Internet-based services, such as lead generation and website design, to increase the number of units rented at their storage facilities. (Am. Countercls. ¶ 15.) For example, a self-storage-facility owner might contract with a third-party company for access to software that compiles information about potential customers.

## C.  SiteLink's API

{20}     SiteLink does not provide Internet-based services, but it maintains a "Partner" program through which it allows third-party Internet-based-service providers to use its API to access real-time data for mutual customers. (Am. Countercls. ¶¶ 27–29.) The API facilitates communication between software applications, which allows the third-party companies to provide services to SiteLink and the third-party companies' mutual customers (e.g., a website that contains payment functions and integrates with SiteLink's FMS).

{21}     Use of the API is subject to SiteLink's licensing terms. (Am. Countercls. ¶¶ 28–30.)

---

[2] SiteLink refers to its management software as business-management software, or BMS, rather than FMS. For purposes of this Order & Opinion, the labels "FMS" and "BMS" refer to the same type of software.

{22}     When Red Nova began its operations in 2009, it offered only online-marketing and website-design services.  By 2011, Red Nova had begun to offer other online services, including Internet-based lead generation.  (Am. Countercls. ¶ 16.) At that time, Red Nova used SiteLink's API to provide Internet-based services to SiteLink's FMS customers but did not offer its own FMS platform.  (Am. Countercls. ¶¶ 17, 23.)

{23}     Red Nova learned from customers that FMS platforms, including SiteLink's products, "were falling woefully short of meeting" customer needs.  (Am. Countercls. ¶ 17.)  In particular, Red Nova was advised that SiteLink's online platform did not integrate well with other software functions used in the industry, including those that were the core of Red Nova's product.  (Am. Countercls. ¶ 19.)

{24}     In fall 2012, Red Nova approached SiteLink to propose that the companies collaborate to provide an FMS platform that could respond to the customer needs that Red Nova had identified.  SiteLink declined Red Nova's proposed collaboration.  (Am. Countercls. ¶ 21.)  At that time, approximately 40% of Red Nova's customers were also SiteLink's customers.  (Am. Countercls. ¶ 22.)

{25}     Following its discussions with SiteLink, Red Nova continued to use SiteLink's API to offer Internet-based services to SiteLink customers.  (Am. Countercls. ¶ 23.)

{26}     By 2013, Red Nova had begun to develop its own FMS platform.  In January 2014, Red Nova released a "beta" version of its FMS known as storEDGE to two customers, followed by the general release of its FMS in April 2015.  (Am. Countercls. ¶¶ 24–25.)

{27}     SiteLink first learned of Red Nova's efforts to develop its own FMS platform in fall 2013.  (Am. Countercls. ¶ 33.)  Red Nova alleges that, at that point, SiteLink began a campaign to prevent Red Nova's FMS from progressing.  (Am. Countercls. ¶ 34.)  That campaign included efforts by SiteLink to divert Red Nova and SiteLink's mutual customers away from Red Nova, encouraging the customers to switch to SiteLink's other partners to fulfill their Internet-based-service needs. (Am. Countercls. ¶ 35.)

## D. SiteLink's API and Software Licensing Agreements

{28}    Red Nova used SiteLink's API to provide Internet-based software services until January 2014, when SiteLink terminated Red Nova's license to use the API after learning that Red Nova would offer a competing FMS product.

{29}    SiteLink now requires customers that use its online-management program to enter into two agreements: (1) the Application Programming Interface and User Agreement ("API License"), and (2) the SiteLink Web Edition License and Service Agreement ("Software License").[3]  Red Nova complains that SiteLink uses these licenses to maintain an unlawful anticompetitive advantage and to forestall Red Nova's ability to compete with SiteLink.  (Am. Countercls. ¶¶ 30–31.)

{30}    SiteLink modified its API License on April 28, 2014.  The modified API License provides that an API user shall "[n]ot compete directly, or through an affiliate company, or through [sic] related third party with SiteLink," or "operate in conflict of interest to SiteLink, or in a manner detrimental to the reasonable business interests of SiteLink, or in conflict with the services provided by SiteLink." (Verified Compl. Prelim. Inj., Permanent Inj. and Other Relief ("Compl.") Ex. B, ¶ 3(R)–(S) (providing that, for purposes of the API License, "'related third party' shall include, but not be limited to, User's other vendors or service providers").)

{31}    The modified API License further provides that a licensee's access to the API will automatically terminate if the licensee violates the terms of the license. (Compl. Ex. B, ¶ 7.)

{32}    Before the API License was modified in April 2014, it did not include the new restrictions that appear in the modified version, but it did require licensees to disclose to SiteLink any potential conflicts of interest that the licensee had with SiteLink.  (Compl. Ex. C, ¶ 9.)

---

[3] Red Nova's counterclaims address these licenses specifically, and the licenses' provisions are an integral basis for Red Nova's claims.  It is therefore appropriate for the Court to consider the licenses when ruling on the Motion. *See Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60–61, 554 S.E.2d 840, 847 (2001).  The licenses are attached as exhibits A–C to SiteLink's original complaint.

{33} SiteLink's FMS Software License provides that SiteLink may terminate either the licensee's or a third party's right to use SiteLink's software if "[the licensee] or related third party operate in competition with [SiteLink]" or "[the licensee] or related third party operate in conflict of interest with [SiteLink]." (Compl. Ex. A.) If the license is terminated for either of these reasons, the termination is deemed to be for "cause," and SiteLink is excused from any obligation to store or provide access to the user's data. (Compl. Ex. A.)

{34} In sum, these provisions provide that (1) no service provider may use SiteLink's API if the service provider competes with SiteLink, and (2) no SiteLink licensee may use SiteLink's software if the licensee is also obtaining services from one of SiteLink's competitors. (Am. Countercls. ¶ 31.) Thus, under the agreements, as long as Red Nova offers FMS services that compete with SiteLink's services, Red Nova cannot access SiteLink's API, and no facility owner or operator that uses any of Red Nova's products or services can use SiteLink's software.

## E. SiteLink Terminates Red Nova's Access to the API

{35} In January 2014, SiteLink sent a letter to Red Nova advising that Red Nova was no longer authorized to use SiteLink's API. SiteLink also sent letters to SiteLink and Red Nova's mutual customers, instructing those customers that they could continue using SiteLink's platform only if they switched from Red Nova to other Internet-based-service providers that did not compete with SiteLink. (Am. Countercls. ¶¶ 35–37.)

{36} Red Nova complains that SiteLink's campaign included a number of false statements to Red Nova customers, including statements that customers contracting with Red Nova while using SiteLink's software were violating their existing license agreements, that Red Nova had engaged in "shameless theft and abuse" of SiteLink's property, and that customers could switch to other vendors without significant consequences. (Am. Countercls. ¶¶ 38–39.) Red Nova also complains that SiteLink improperly provided financial incentives to customers that switched from Red Nova to other, noncompeting vendors. (Am. Countercls. ¶ 40.)

{37}   SiteLink's purpose in modifying its API License in April 2014 was to implement this restriction.  (Am. Countercls. ¶ 43.)

{38}   Red Nova has lost customers as a result of SiteLink's various efforts. (Am. Countercls. ¶ 42.)

## F.  Red Nova's Contentions

{39}   Red Nova avers that SiteLink's campaign was

> done for anticompetitive purposes, including to protect an inferior product from competition, to divert potential competitors, to maintain artificially high prices, to punish competitors and potential competitors, to make an example out of Red Nova, to monopolize the market for FMS, and to leverage its domination of the market for FMS to control and dictate winners and losers, pricing, and other terms, in the broader market for technology for self-storage industry.

(Am. Countercls. ¶ 46.)  They further allege that "SiteLink's actions were intended to, and did, have the effect of stifling legitimate competition in the market for self-storage FMS products and services."  (Am. Countercls. ¶ 46.)

{40}   Red Nova's counterclaims contain no other allegations regarding pricing, nor do they describe or identify other actual or potential SiteLink competitors or customers who have suffered any loss or harm from SiteLink's licensing program.

{41}   Red Nova's broadly worded twenty-six paragraph chapter 75 claim incorporates sections 75-1, 75-1.1, 75-2, and 75-2.1, and includes allegations of (1) false statements, (2) combinations and acts in restraint of trade or commerce, (3) collusion to coerce customers not to deal with SiteLink's competitors, (4) use of market power to monopolize or attempt to monopolize, (5) illegal tying, (6) unfair competition, (7) improper pricing, and (8) conduct that otherwise impedes Red Nova's ability to enter or compete in the marketplace.  (Am. Countercls. ¶¶ 63–65, 73–74, 76, 80, 84.)

{42}   The general factual allegations of the counterclaims include several references to a "market," which Red Nova loosely defines.  Red Nova uses each of the following descriptions to refer to an alleged market:

- "the marketplace for facility management software ("FMS") for the self-storage industry" (Am. Countercls. ¶ 2);
- "the marketplace for software solutions for the self-storage industry" (Am. Countercls. ¶ 3);
- "[t]he self-storage industry generally" (Am. Countercls. ¶ 3);
- "the self-storage market" (Am. Countercls. ¶¶ 13, 24);
- "the market to provide these collateral offerings to SiteLink clients" (Am. Countercls. ¶ 27);
- "segments of the market" consisting of SiteLink customers who agree not to develop products that compete with SiteLink (Am. Countercls. ¶ 28);
- the "market that SiteLink considers its own" (Am. Countercls. ¶ 45); and
- "the broader market for technology for self-storage industry" (Am. Countercls. ¶ 46.)

{43}   Ultimately, Red Nova avers that SiteLink has stifled competition "in the market for self-storage FMS products and services." (Am. Countercls. ¶ 46.)

{44}   Red Nova does not allege that SiteLink offers or intends to offer any software product in the market other than its FMS, including the online version of its FMS that is accessed through the API portal.

{45}   Red Nova's claims for monopolization or attempted monopolization are cast in reference to SiteLink's position in "the market for self-storage FMS, including within North Carolina." (Am. Countercls. ¶ 67.) Red Nova alleges that there are "significant and high barriers" to entry in this market, including "customer investment in learning the functions of the management software," "high cost of moving from one management software solution to another, including data conversion costs," and "high monetary and time investment required to build . . . competing FMS offerings." (Am. Countercls. ¶ 70.) Red Nova does not allege how these barriers are different from the normal barriers to entry that a customer faces when switching from one platform to another in the normal course of business.

{46} Although Red Nova asserts these barriers to entry, it also alleges that the market is "underserved and inefficient." (Am. Countercls. ¶ 3.) In particular, Red Nova notes that "a well-functioning and highly integrated FMS [is] a linchpin to customers' technological needs," but that, because SiteLink's product is "falling woefully short of meeting those needs," SiteLink's customers are unhappy with its product offering. (Am. Countercls. ¶¶ 17–18.)

{47} Red Nova summarily concludes that SiteLink is "by far the dominant player in the market for management software for self-storage facilities." (Am. Countercls. ¶ 12.) That characterization is based on SiteLink's 35% to 40% share in the market for self-storage facilities that use specialized management software—a market that, again, by Red Nova's admission, includes less than half of all self-storage facilities. (Am. Countercls. ¶¶ 12, 15.)

{48} Some companies that have agreed to SiteLink's license restrictions also compete with Red Nova in the sale of website marketing and e-commerce platforms. (Am. Countercls. ¶ 5.) Red Nova alleges that SiteLink's exclusionary agreements and arrangements have caused "cognizable antitrust injury by preventing its victims from making free and unhindered choices between market alternatives." (Am. Countercls. ¶ 77.)

{49} Red Nova alleges that it has lost customers and revenue but does not otherwise allege financial loss by any of Red Nova's or SiteLink's customers. (Am. Countercls. ¶ 78.)

## IV. STANDARD OF REVIEW

{50} The Court will grant a motion to dismiss under Rule 12(b)(6) when any of three things is true: (1) no law supports the plaintiff's claim, (2) the complaint does not plead sufficient facts to state a legally sound claim, or (3) the complaint discloses a fact that defeats the plaintiff's claim. *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Strickland v. Hedrick*, 194 N.C. App. 1, 20, 669 S.E.2d 61,

73 (2008) (quoting *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005)), and it may ignore plaintiff's legal conclusions, *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

## V.  ANALYSIS

### A. <u>The Antitrust Claims</u>

{51}   SiteLink's Motion seeks to dismiss Red Nova's antitrust claims in their entirety.  The broad nature of the allegations has required the Court to examine the legality of SiteLink's licensing program under the lens of the various antitrust theories invoked by the counterclaims.

{52}   The Motion must be decided as a matter of state law; however, it is proper for the Court to consult federal case law.  *See Rose v. Vulcan Materials Co.*, 282 N.C. 643, 656–57, 194 S.E.2d 521, 530–31 (1973) (consulting federal decisions to inform the court's restraint-of-trade analysis).  The Court is fully cognizant that the Motion must be resolved under North Carolina's lenient Rule 12(b)(6) standard rather than the more exacting federal plausibility standard that governs the federal antitrust precedents that the parties cite in their briefs.  *Compare Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970) (noting that a pleading complies with North Carolina's standard if it gives sufficient notice of the events underlying the claims), *with Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (requiring that a complaint must state a plausible claim).

{53}   Even North Carolina's more lenient standard, however, does not allow a party to withstand a Rule 12(b)(6) motion based on conclusory allegations that are not supported by underlying factual allegations.  *See Sutton*, 277 N.C. at 98, 176 S.E.2d at 163.  Having completed a thorough review of the pleadings, briefs, and authorities, and adhering to the controlling North Carolina standard of review, the Court concludes that Red Nova's counterclaims fail to state an actionable antitrust claim under sections 75-1, 75-2, and 75-2.1.

{54} Sections 75-1 and 75-2 proscribe restraints of trade or commerce. N.C. Gen. Stat. § 75-1 (prohibiting all "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies] in restraint of trade or commerce"); *id.* § 75-2 (prohibiting restraints of trade that violate common-law principles). Section 75-1 requires a contract, combination, or conspiracy, whereas a section 75-2 claim can rest on a defendant's unilateral conduct. *See id.* §§ 75-1, -2. Although the prohibitions in sections 75-1 and 75-2 might be read to extend to monopolization or attempted monopolization, the more recently enacted section 75-2.1 expressly prohibits monopolization or attempts to monopolize any part of trade or commerce in North Carolina. *See id.* § 75-2.1.

### 1. The API License Is Not an Illegal Vertical Restraint of Trade.

{55} With certain narrow exceptions, sections 75-1 and 75-2, like their federal counterparts, prohibit restraints of trade or commerce only when such restraints are unreasonable. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998); *Waldron Buick Co. v. Gen. Motors Corp.*, 254 N.C. 117, 125–26, 118 S.E.2d 559, 566 (1961). Restraints of trade are most often evaluated under the rule of reason. *See E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 135 (2d Cir. 1984).

{56} Certain restraints of trade, such as price-fixing agreements, are so pernicious that they are presumed to cause injury to competition. *See NYNEX*, 525 U.S. at 133–34. These types of restraints, known as per se violations, are not analyzed under the rule of reason. The United States Supreme Court has been reluctant to recognize per se violations. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723–26 (1988) (outlining cases in which the Supreme Court limited per se illegality).

{57} This Court is likewise reluctant to find a per se violation of North Carolina's antitrust statutes without clear cause to do so. Although Red Nova's counterclaims include a broad conclusory allegation that agreements between SiteLink and its customers have resulted in artificially high pricing—an illegal-

vertical-restraint theory—Red Nova pleads no underlying factual allegations to support that generalized conclusion. The Court finds no basis, even under North Carolina's liberal pleading standard, to further consider any claim that is based on improper pricing, including a claim of a per se violation arising from an alleged illegal vertical restraint.

## 2. The API License Is Not an Illegal Group Boycott.

{58} Red Nova further invites the Court to find a per se violation based on an unlawful group boycott or SiteLink's unlawful refusal to deal. Admittedly, some group boycotts may rise to the level of a per se violation, but not when the boycott is based on a vertical agreement with no pricing restraints. *NYNEX*, 525 U.S. at 135 (noting that "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors"). Red Nova does not allege any horizontal agreement among SiteLink and its competitors. The Court concludes that Red Nova's allegations, even when accepted as true, do not allege a per se group boycott.

## 3. The Factual Allegations Are Not Adequate to Plead an Illegal Refusal to Deal or an Illegal Tying Arrangement.

{59} To prevail on a claim that is based on "antitrust injury," Red Nova must allege injury not only to itself but to competition. *See Cobb Theatres III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1334–35 (N.D. Ga. 2015). As a general rule, antitrust law does not limit a business's right to choose with whom it will deal and to refuse to deal with others. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). This general rule is subject to limited exceptions, which courts have recognized with caution. *See id.*

{60} A claim based on a refusal to deal is generally brought as a claim for monopolization or attempted monopolization, which requires a demonstration of market power. *See id.* at 408–09 (discussing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985)).

{61}    Red Nova's attack on SiteLink's API License more closely resembles a claim that the license is an unlawful tying arrangement.  Specifically, Red Nova alleges that the API License is a negative tying arrangement.

{62}    A negative tying agreement is an agreement by which a seller or provider conditions its sale or license of a product or service on the purchaser's or user's agreement not to do business with a seller or provider of a different product. Red Nova relies on *Image Technical Service, Inc. v. Eastman Kodak Co.* to assert that SiteLink has engaged in an illegal negative tying arrangement.  903 F.2d 612 (9th Cir. 1990).  There, the court explained that

> [a] tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product, *or at least agrees that he will not purchase that product from any other supplier*."  A tying arrangement is *per se* unreasonable if the defendant has sufficient economic power in the tying product market to restrain competition appreciably in the tied product market and if the arrangement affects more than an insubstantial volume of interstate commerce in the tied product.

*Id.* at 615 (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958)).

{63}    Accordingly, Red Nova must have alleged that SiteLink has sufficient economic power in the management-software market—assuming that market is a separate recognized market—to appreciably restrain competition in the market for other software services offered to self-storage-facility owners or operators.  *See id.* Conversely, a mere tying arrangement is not illegal if it is not accompanied by sufficient market power in the tying product market to have a substantial impact in the tied product market.  *Id.*

{64}    Even if the Court first accepts that Red Nova has adequately alleged that SiteLink has substantial market power in some properly defined tying market, presumably an FMS market, Red Nova has made no attempt to allege that SiteLink has either sought or obtained power in a market for other software products.  To the contrary, the counterclaims demonstrate that SiteLink has not attempted to sell any product or service other than its management software.

{65}    SiteLink asserts that it then must be protected by the general rule that a seller is free to choose with whom to deal.  This general rule must be read in conjunction with the limitation that a market participant with substantial market power cannot misuse that power.  SiteLink contends that it would be wholly improper for it to be required to allow Red Nova access to its API for the very purpose of being SiteLink's competitor.  A claim that one competitor must allow another competitor access to its platform is a difficult one to sustain.  *See Verizon Commc'ns*, 540 U.S. at 407–08, 410; *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 375 (7th Cir. 1986) ("[I]t is clear that a firm with lawful monopoly power has no general duty to help its competitors, whether by holding a price umbrella over their heads or by otherwise pulling its competitive punches.").

{66}    SiteLink relies in part on *Sambreel Holdings LLC v. Facebook, Inc.*, in which a federal court upheld Facebook's refusal to allow the plaintiffs, online-display-advertising companies, to access Facebook's platform to offer various social-media applications.  906 F. Supp. 2d 1070, 1080–81 (S.D. Cal. 2012).

{67}    In *Sambreel*, the plaintiffs alleged that Facebook's attempts to eliminate competition in the sale of online display advertising by offering its website only to users who agreed not to use the plaintiffs' social-media applications, and who agreed to uninstall existing downloads of the plaintiffs' applications, constituted illegal negative tying.  *Id.* at 1080.

{68}    In granting Facebook's motion to dismiss and denying the plaintiffs' motion for preliminary injunction, the court noted the following:

> As an overarching premise, the Court is persuaded that Facebook has a right to control its own product, and to establish the terms with which its users, application developers, and advertisers must comply in order to utilize this product.  Indeed, it is well settled that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"

*Id.* at 1075 (alteration in original) (quoting *Verizon Commc'ns*, 540 U.S. at 408).

{69}    The court further commented on the plaintiffs' assertion that Facebook had engaged in an illegal negative tying arrangement:

> [J]ust as Facebook has the right to determine the terms on which it will permit its Application Developers to use the Facebook Platform, it has a right to dictate the terms on which it will permit its users to take advantage of the Facebook social network. There is no fundamental right to use Facebook; users may only obtain a Facebook account upon agreement that they will comply with Facebook's terms, which is unquestionably permissible under the antitrust laws.

*Id.* at 1080 (citations omitted).

{70}    Red Nova argues that *Sambreel* must be distinguished on multiple grounds. First, Red Nova opines that its counterclaims must be viewed through the lens of North Carolina's more liberal pleading standard, whereas *Sambreel* was decided on the more stringent federal plausibility standard. Second, Red Nova argues that its counterclaims allege other anticompetitive conduct that was not present under the facts of *Sambreel* that demonstrates SiteLink's abuse of its market power.

{71}    To support its second argument, Red Nova cites *Kickflip, Inc. v. Facebook, Inc.*, a case that discusses and distinguishes *Sambreel*. 999 F. Supp. 2d 677, 685 (D. Del. 2013). There, Kickflip, a company that provides payment and virtual-currency processing to software developers, brought antitrust claims against Facebook, alleging that Facebook excluded Kickflip from its virtual-currency service and precluded its application developers from doing business with Kickflip. *Id.* at 682.

{72}    Facebook relied on *Sambreel* to challenge Kickflip's standing on the ground that Kickflip failed to allege antitrust injuries. *Id.* at 685. Noting that Kickflip's reliance on *Sambreel* was misplaced, the court held that Kickflip's description of the relevant markets—the virtual-currency-services and social-gaming-networks markets—were not "facially unsustainable." *Id.* at 687 (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

{73}    First, the court found that Kickflip had adequately described an identifiable virtual-currency market to survive a motion to dismiss, and then

concluded that Kickflip had sufficiently alleged that Facebook had monopoly power in that market, based on Facebook's 90% market share. *Id.* at 687–88. After determining that Kickflip had adequately alleged that Facebook possessed monopoly power in the relevant market, the court held that Kickflip had alleged a per se unlawful tying arrangement. *Id.* at 689. Alternatively, it held that Kickflip had sufficiently alleged harm to competition that was adequate to satisfy a rule-of-reason analysis. *Id.*

{74}   The *Kickflip* court provided the following instructive summary:

> Monopoly power under the Sherman Act requires: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." To plead monopoly power, "a plaintiff typically must plead and prove that a firm has a dominant share in a relevant market, and that significant 'entry barriers' protect that market." Defining a relevant market is a question of fact, and the plaintiff bears the burden of proof. A court may dismiss a claim for failure to define the relevant market. "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . , the relevant market is legally insufficient."

*Id.* at 686–87 (first quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306–07 (3d Cir. 2007); then quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

### 4. Red Nova's Allegations Regarding SiteLink's Market Power Are Insufficient to Maintain Its Antitrust Claims.

{75}   There is evident overlap in Red Nova's counterclaims, to the extent that Red Nova attempts to allege illegal tying and monopolization or attempted monopolization, because each theory requires sufficient allegations of market power. Red Nova's allegations are insufficient under these theories, even as a matter of pleading.

{76}    Courts are reluctant to dismiss claims on a Rule 12(b)(6) motion based on a failure to plead a relevant product market or sufficient market power, because defining a relevant market and a party's power within that market may ultimately require a fact-intensive inquiry. *See Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001). But courts do not countenance the pursuit of necessarily broad discovery that relates to defining market power when it is based solely on conclusory allegations. Here, the Court finds that Red Nova's allegations do not adequately support its conclusions regarding market power.

{77}    A case decided by former Chief Judge Frank Bullock of the U.S. District Court for the Middle District of North Carolina provides an informative and extensive discussion of the principles of market power that apply in the context of monopolization or attempted-monopolization claims. *R.J. Reynolds Tobacco Co. v. Philip Morris Inc.*, 199 F. Supp. 2d 362, 381–86 (M.D.N.C. 2002). While, admittedly, that case was decided at summary judgment, the court's analysis is useful in assessing a Rule 12(b)(6) motion.

{78}    The factors that ultimately must be examined in assessing a market include defining a product or service market in which a competitor has the power to artificially raise and sustain supracompetitive prices. *Id.* at 381. Generally, that power must be accompanied by some restriction on output. *Id.* at 382. From there, a court is required to examine the interchangeability and cross-elasticity of supply and demand and assess whether there are significant barriers to a competitor's entry into the market. *Id.* at 382–84.

{79}    A court must inquire into both defining the market and the defendant's power within that market. *Id.* at 394. As Judge Bullock summarized in *R.J. Reynolds*, to prevail on a monopolization claim,

> Plaintiffs "must show possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." To prevail on an attempted monopolization claim, Plaintiffs must demonstrate (1) a specific intent to monopolize a relevant market; (2) predatory or anticompetitive acts; and (3) a dangerous probability of successful monopolization.

> Courts have imposed on antitrust plaintiffs certain threshold showings as to market share in a relevant market before they may proceed on a monopolization claim.

*Id.* (quoting *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990)).

{80}     Although each case turns on a fact-specific inquiry, courts often apply certain presumptions. Case law has identified general guidelines for measuring market power. Generally speaking, a 70% to 75% market share is necessary to sustain a monopolization claim, *see id.*, and a market-share range between 30% and 50% is presumed necessary to sustain a claim for attempted monopolization, *see M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 168 (4th Cir. 1992). While "market share" is often used to describe "market power," market share alone does not prove monopoly power. *Cobb Theatres III, LLC*, 101 F. Supp. 3d at 1341 (discussing whether certain percentages of market share constitute monopoly power as a matter of law).

{81}     After careful analysis, and being fully mindful that the Motion is at the 12(b)(6) stage and is governed by North Carolina's liberal pleading standard, the Court concludes that Red Nova has not alleged minimal facts to pursue its claim that SiteLink possesses adequate market power or has misused its market power.

{82}     The narrowest market suggested by Red Nova's counterclaims is the market for facility-specific management software for facility owners and operators in the self-storage industry. Such a narrow market would exclude any portion of the broader group of self-storage-facility owners and operators that use other, more-general software, such as a standardized database program like Microsoft Access, or a more generalized financial-management program like QuickBooks. (Am. Countercls. ¶¶ 11–12.) The Court need not, and does not, express any opinion on whether a market that is so narrowly defined is a proper market. But RedNova's own allegations show that, even in this narrow market, SiteLink's market share does not exceed 35% to 40%. The counterclaims contain no facts regarding any participant in such a narrow market other than SiteLink or Red Nova. Likewise,

the counterclaims do not allege whether any market participant other than Red Nova offers both FMS and other Internet-based platforms. Red Nova clearly alleges that SiteLink offers only FMS.

{83} The Court is not here pronouncing a general rule. The particular facts of each case are critical to any court's inquiry. But it is fair to conclude that, even under North Carolina's liberal pleading standard, to survive a Rule 12(b)(6) motion, an antitrust plaintiff that presents claims of the type that Red Nova pursues should be required to demonstrate some minimal set of well-grounded factual allegations to support an assertion of market power. This is particularly true when the plaintiff's market share is at the bottom end of the percentage of market share adequate to sustain a claim for attempted monopolization, according to presumptions recognized by case law.

{84} Resolving SiteLink's Motion has not required the Court to abandon North Carolina's liberal pleading standard in favor of the federal plausibility standard. Clearly, a claim that one competitor suffered injury by the acts of another competitor, without more, does not rise to the level of an actionable antitrust claim. Red Nova has failed to allege an antitrust claim. Red Nova's other claims, which were not challenged by the Motion, if proven, may be adequate to provide redress.

{85} SiteLink's Motion to dismiss the antitrust claims under sections 75-1, 75-2, and 75-2.1 should be GRANTED, and those claims are DISMISSED without prejudice.

## B. The Section 75-1.1 Claim

{86} Red Nova's section 75-1.1 claim, to the extent that claim is based on SiteLink's API License, depends on Red Nova's antitrust claims. (*See* Def. Red Nova's Resp. to Pl. SiteLink's Mot. Dismiss Countercls. 8 ("Red Nova's antitrust claims are sufficiently pled and, therefore, its unfair competition claim—to the extent based on Site[L]ink's alleged anticompetitive behavior—should also survive this Motion.").) Specifically, Red Nova claims that the API License violates section

75-1.1 because the license is anticompetitive and constitutes an illegal restraint of trade.

{87} When a section 75-1.1 claim derives solely from an antitrust claim, the failure of the antitrust claim also defeats liability under section 75-1.1. *See, e.g., R.J. Reynolds*, 199 F. Supp. 2d at 396. Thus, to the extent that Red Nova's section 75-1.1 claim is based on the API License, SiteLink's Motion to dismiss Red Nova's section 75-1.1 claim is GRANTED. The section 75-1.1 claim otherwise survives.

## C. The Tortious-Interference-with-Contract Claim

{88} SiteLink moves to dismiss Red Nova's claim for tortious interference with contract only to the extent that the tortious-interference claim is based on SiteLink's enforcement of the API License.

{89} A claim for tortious interference with contract requires

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff.

*Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992) (quoting *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

{90} Like the section 75-1.1 claim, portions of Red Nova's tortious-interference claim appear to overlap with the failed antitrust claims. Any portion of the tortious-interference claim that derives from Red Nova's assertion that the API License is "anticompetitive" and constitutes an illegal restraint of trade should not continue. (*See, e.g.*, Am. Countercls. ¶ 51.)

{91} The Court further concludes that SiteLink's mere enforcement of the API License by terminating users' licenses is not an act that was done "without justification." *Embree Constr. Grp.*, 330 N.C. at 498, 411 S.E.2d at 924.

{92} Accordingly, to the extent that Red Nova's tortious-interference claim is based on SiteLink's mere enforcement of the API License, SiteLink's Motion to dismiss is GRANTED.

### D. The Anticipatory-Repudiation-of-Contract Claim

{93} SiteLink also moves to dismiss Red Nova's claim for anticipatory repudiation of contract, to the extent that claim is based on SiteLink's API License.

{94} A claim for anticipatory repudiation occurs "[w]hen a party repudiates his obligations under the contract *before* the time for performance under the terms of the contract." *Millis Constr. Co. v. Fairfield Sapphire Valley, Inc.*, 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987).

{95} Red Nova's anticipatory-repudiation claim is unclear. The claim appears to rest primarily on the January 13, 2014 letter from SiteLink to Red Nova, in which SiteLink advised Red Nova that it would prevent Red Nova and its customers from accessing data through SiteLink's API. (Am. Countercls. ¶ 54; Mot. Dismiss Countercls. Ex. 5.) Red Nova contends that SiteLink's letter constituted an anticipatory repudiation of the API License.

{96} If the anticipatory-repudiation claim is directed at SiteLink's licenses with Red Nova's customers, the claim fails, because Red Nova has no standing to seek redress for an injury sustained by its customers.

{97} The claim also fails if it is directed at SiteLink's license with Red Nova. Red Nova fails to allege that SiteLink's letter was anything other than a notice of SiteLink's intent to terminate Red Nova's API License in the manner set forth in the API License's provisions for termination. (Compl. Ex. C, ¶ 7 (providing that SiteLink could terminate a licensee's right to use the API "at SiteLink's sole discretion, at any time, for any reason, with or without notice").) And Red Nova cannot base its contract claim on its failed antitrust theory that the API License constitutes an illegal restraint of trade.

{98} Accordingly, SiteLink's Motion to dismiss Red Nova's anticipatory-repudiation claim is GRANTED.

## VI. CONCLUSION

{99} For the reasons stated in this Order & Opinion, the Court GRANTS SiteLink's Motion as follows:

1. Red Nova's antitrust claims under N.C. Gen. Stat. §§ 75-1, 75-2, and 75-2.1 are DISMISSED.

2. Red Nova's claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 is DISMISSED IN PART, to the extent the claim is based on the API License.

3. Red Nova's claim for tortious interference with contract is DISMISSED IN PART, to the extent the claim is based on the API License.

4. Red Nova's claim for anticipatory repudiation of contract is DISMISSED.

IT IS SO ORDERED, this the 14th day of June, 2016.

/s/ James L. Gale
_____
James L. Gale
Chief Special Superior Court Judge
  for Complex Business Cases